La Salle National Bank, etc., Plaintiff-Appellee, v. International Limited, Defendant and Third-Party Plaintiff-Appellant, v. Palatial Builders, et al., Third-Party Defendants-Appellees, and John Andermann and Marie Andermann, Plaintiffs-Appellees, v. Sterlingshire Manor Co., Inc., Defendant and Third-Party Plaintiff-Appellant, v. Palatial Builders, et al., Third-Party Defendants-Appellees, Raymond Green, Counterclaimant-Appellee, v. International Limited, and Sterlingshire Manor Co., Inc., Counterdefendants-Appellants.

Gen. No. 69–208.

Second District.

September 25, 1970.

Rehearing denied November 19, 1970.

Nicholas T. Kitsos, of Chicago, and O'Brien, Burnell, Puckett & Barnett, of Aurora, for appellants.

Rathje, Woodward, Dyer and Burt, of Wheaton, for appellee.

MR. PRESIDING JUSTICE DAVIS delivered the opinion of the court.

This is an appeal from a decree which was entered in two declaratory judgment actions, consolidated for trial, involving different, but related, parties, and parcels of real estate. In each action the plaintiff sought a determination that the defendant had improperly recorded a memorandum of sale contract, and sought an injunction restraining the defendant from claiming an interest in the land. In each action the defendant counterclaimed and filed a third-party action, claiming an interest in the land. The third-party defendants also counterclaimed and sought essentially the same relief as sought by the plaintiffs—a declaration that the defendants had no interest in the real estate.

The trial court entered a decree dismissing the original complaints, the third-party complaints, and all of the counterclaims except that of Raymond Green, a third-party defendant-counterclaimant. It found in favor of Green on his counterclaim, and by decree declared that the defendants had no interests in the real estate; that the contracts in question had been rescinded, and that the earnest money should be returned. The defendants—third-party plaintiffs—have appealed.

On April 21, 1966, three contracts were partially executed. Under the first agreement, Palatial Builders, Inc., as "Seller" agreed to sell to International Limited, as "Purchaser," 129 subdivided lots, for a total consideration of $606,300. The LaSalle National Bank, as Trustee under Trust No. 34919, was a party to the agreement as legal titleholder to the premises. All of the parties, ex-

384

cept the LaSalle National Bank, as Trustee, executed the agreement. Under the second agreement, the LaSalle National Bank, as Trustee under Trust No. 34924, as "Seller" agreed to sell to Sterlingshire Manor Co., as "Purchaser," 70 unsubdivided nearby acres. This agreement was executed by Sterlingshire, but not by the Bank, as Trustee. The third agreement was between Palatial Builders and LaSalle National Bank, as Trustee of Trust No. 34924, as affiliated parties, and International and Sterlingshire, as affiliated parties. It provided, in part, that International would have the sole option of determining whether it would proceed to consummate the first transaction, but that Sterlingshire would have no option to purchase the real estate covered under the second agreement unless International consummated the first agreement. This agreement, likewise, was executed by all parties, except the Bank, as trustee.

The first agreement, which we shall call the "International Agreement," was a twenty-five page document, which provided for the conveyance of the 129 lots in four, take-out units: the first unit to be conveyed on the "closing date," the second within one year thereafter, the third within two years thereafter, and the fourth within three years thereafter. The "closing date" was defined as being fifteen days after the platting of all the lots and the receipt of a satisfactory preliminary report of title. The purchase price of $606,300 was to be paid as follows: $10,000 upon the execution of the agreement (which amount was paid on April 21, 1966); $163,900 upon the conveyance of the first take-out unit; and $4,700 per lot, upon the subsequent conveyances. Numerous other terms, many conditions and obligations were set forth in this contract, to which we shall refer herein when necessary.

The second agreement, which we shall call the "Sterlingshire Agreement," provided for the conveyance of 70 acres of land, nearby the property in the first agreement:

385

17 acres of which was to be conveyed on the "closing date," 17 acres on each of the first and second anniversaries of the "closing date," and the balance on the third anniversary thereof. The "closing date" was a date in 1966, to be inserted by the parties at a later time. The purchaser, Sterlingshire, agreed to pay $5,000 per acre for this land, or a total of approximately $350,000. The purchase price was to be paid as follows: $101,500 on the "closing date"; $85,000 on the first and second anniversaries thereof, and the balance on the third anniversary.

The third agreement, as we indicated above, referred to the first two agreements. It stated that the parties intended that both such agreements were to be consummated "if at all possible." This agreement related that International had the option, at its sole discretion, to determine whether to consummate the first agreement, but if it chose not to do so, it would lose its $10,000 earnest money payment. If International chose not to proceed, then Sterlingshire was not given the option of determining whether it wanted to consummate the Sterlingshire contract. But, if both parties to the Sterlingshire agreement determined to proceed, even though the International agreement was not consummated, then International was to have its earnest money refunded. In this manner, the third agreement spelled out the relationship between the first two agreements.

The parties to this litigation have devoted considerable space in their respective briefs with reference to the status of the legal title to the premises; to other agreements which affected the title to the various parcels of real estate, and to the question of who were the real parties in interest in the real estate. Suffice it to say that for the purpose of this opinion, the Bank held legal title to the premises, as trustee; Palatial Builders, Inc. acted as the true owner thereunder, and Raymond Green was

the sole or substantial stockholder of Palatial and the ultimate interested party. Likewise, the Andermanns held legal title to the other parcel for the benefit of Raymond Green; and Sterlingshire and International were both controlled and owned by Bruno and Anthony Pasquinelli. So, in the final analysis, the plaintiffs and third-party defendants all represented the interest of Green and a close associate, and the defendants and third-party plaintiffs all represented the interests of the Pasquinellis. Each interest was acting, or contemplated acting, through corporate entities.

At the time the contracts were entered into, Palatial had commenced construction of four model homes, which, as a part of the transaction, International was to purchase at Palatial's net cost. Some time in June of 1966, International entered on the premises and continued the construction of these homes which Palatial had started.

The meeting of April 21, 1966, at which the agreements were signed, lasted from about 2:00 p. m., until about 11:00 p. m. The evidence was conflicting with reference to what transpired at this meeting, the intention of the parties relative to the purpose of the signed agreements, and what was to follow.

Witnesses for the Green, or seller interests, testified that at this meeting—which was attended by Green, the Pasquinellis, their respective attorneys and a realtor—the proposed agreements were discussed and changed throughout the nine-hour period; that a number of changes or additions were brought up late in the day, which the parties were unable to finalize; and that some of the discussed changes were: removing the sale of the houses from this transaction, and perhaps further separating the transactions so that the sellers would be assured of being able to obtain installment sale treatment for tax purposes, the grade of the roads and the costs if the roads were cut deeper, and the costs for

water and sewer stubs. They further testified that Bruno Pasquinelli was leaving immediately for a Florida vacation; that he turned over his $10,000 earnest money check to his attorney and said that he wanted these agreements signed at that time so that he could enjoy his vacation, and that the lawyers could get together to firm the matters up and prepare the final agreements for signature.

The witnesses for the Pasquinellis, or purchaser interests, testified that the essential terms of the agreements were not to be altered after they were executed on April 21, 1966, and that the only changes to be made were those necessary to give the seller a more preferred tax treatment. They further testified that the sellers indicated that they could obtain the signature of the Bank, as trustee, to the agreements, the following day.

Among the changes in the subsequent contract drafts was the addition to the International Agreement of a provision which required the Purchaser to pay to the Seller a fee of $300 for a sewer tap-on for each residence at the time of the issuance of each occupancy permit, not to exceed 124 tap-ons. No such provision appeared in the first draft of the agreement, and it does not appear that this subject was discussed. The first agreement contained only a provision that no water tap-on fees would be charged, and this provision was retained in subsequent drafts.

Witnesses for the seller interests testified that the sewer tap-on fees were discussed at a meeting approximately one and one-half weeks subsequent to April 21, 1966, and that the purchasers objected at first to any sewer tap-on fee, but later, at this meeting, stated that they would pay the fee since they had to pay it to someone.

Between April 21, 1966 and July 26, 1966—a date that later was set for closing—the parties met on several occasions to discuss and work out unresolved problems.

The lawyers for the parties met at least three times a week, and worked on the agreements and redrafts. The lawyer for the purchaser testified to a total of more than forty hours spent between May 2, 1966 and July 18, 1966 at meetings, drafting more detailed instruments and in ironing out disputes concerning these transactions. In addition to the issue of the sewer tap-on fees, other questions arose, such as the responsibility for planting trees, the installation of water service, and the designation of a financial institution to hold the improvement monies in escrow. It appears that in the course of these negotiations, the attorney for the purchaser interests approved the redraft which incorporated the sewer tap-on fees.

In the early part of July, the purchaser interests sent the sellers a notice of a closing date on July 26, 1966. Bruno Pasquinelli had planned that all of the money for improvements, consisting of some $173,000, would be held in escrow by Evergreen Savings and Loan Association, the institution from which he was obtaining finances for this project. Green objected and stated that at least $100,000 of the escrow money had to be placed in the Park National Bank, but this was worked out to the satisfaction of both parties. They then proceeded to prepare for the July 26 closing by working on the necessary escrow instruments.

The July 26 closing was held at Chicago Title and Trust Company in Du Page County. Bruno Pasquinelli indicated he could not close on that date because he was concerned about his money lender's escrow and he did not want to be forfeited out of the transaction by any hitch in the escrow arrangement. A dispute arose over the failure to close, but the sellers finally agreed to an extension to August 2.

The parties then decided to execute the final forms of the agreement and they returned to the office of Green's attorney for this purpose. Bruno Pasquinelli

389

there examined these agreements, said they had been changed from the original draft and objected to certain provisions, including the one which provided for the $300 fee for the sewer tap-on. Green's attorney told Pasquinelli that he had agreed to the tap-on fees a number of times, but Pasquinelli refused to sign the agreements as rewritten. These agreements were never signed; at this point any cordial efforts to resolve their differences were abandoned, and the legal dispute followed.

In capsule form, the foregoing represents the genesis of these actions. The parties dispute many of the foregoing recited facts, and as to our summary of the "third agreement," both parties contend it has a different meaning. After approximately a full month of trial and a review of the voluminous exhibits, including the lengthy basic agreements which were the crux of the matter, the trial court held that both parties had failed to perform under the International agreement, and that it had been rescinded. As to the second, or Sterlingshire, agreement, the court held that it was conditioned upon the performance of the first, and that it likewise, could not be enforced. Thus, the court ordered the parties, in effect, to be returned to their original positions. In view of the nature of the future performance required under the complicated and lengthy documents, the court further indicated that if it were to decree specific performance, constant and prolonged court supervision would be required. This, the court stated, was sufficient reason to deny the relief of specific performance.

 Assuming that a contract existed, we agree with the finding of the trial court. However, we believe the decree of the trial court should be affirmed on another ground. The trial court decreed that the defendants had no interest in the real estate, and that International should have returned to it the $10,000 earnest money. The real issue on appeal is not the reasoning of the trial court nor the basis for its decree, but whether its decree

was correct. Platz v. Walk, 3 Ill2d 313, 318, 121 NE2d 483 (1954) ; In re Estate of Lynch, 65 Ill App2d 162, 168, 212 NE2d 521 (1965).

We are compelled to the conclusion that the signing of the documents on April 21, 1966, did not give rise to binding contractual obligations. The Bank, as trustee, was a party to the International agreement, yet never signed it. More important, however, is the fact that in this complex and involved transaction which was to come into being under these agreements, there were matters not yet determined or resolved at the time of the April 21, 1966 meeting. The testimony of the attorneys for the respective parties is particularly revealing in this regard. From the end of April until the middle of July, they met on many occasions and devoted numerous hours in the preparation, drafting and redrafting of the documents, and in setting up the steps necessary to finalize the transaction. This included the preparation of final drafts of the basic agreements.

While there were a number of areas that had not been completely resolved—questions relating to the trees, water system, road frontage on the first takeout, and the legal action involving the Village of Willowbrook—a basic dispute arose relative to the question of fees for a sewer tap-on. The agreement which was partially executed on April 21, 1966, was silent on this question. The agreement did provide, however, that the seller warranted that no tap-on fees would be charged for connecting the water main. The presence of this express provision —that there would be no fees for water tap-ons—in the absence of a similar one relative to a sewer tap-on fee, might itself suggest that a sewer tap-on fee was anticipated. Suga v. Suga, 35 Ill App2d 355, 359, 182 NE2d 922 (1962) ; Mid-Continent Films v. Essanjay Films, 34 Ill App2d 154, 159, 160, 180 NE2d 748 (1962).

The setting, at which the April 21, 1966 agreements were signed, seems important to us. A number of items

had not yet been resolved as was manifested by the lengthy meeting on that date, at which changes were made throughout in the agreements. Bruno Pasquinelli was anxious to leave that evening for Florida and wanted to be assured before he left that he had a deal. Thus, he was willing to leave his $10,000 earnest money with his attorney, even though all of the parties to the agreement were not there and obviously could not sign the agreements, and even though it was known and understood by the parties that the proposed agreements were not final and had to be redrafted. The basic dispute was relative to the nature and extent of the redrafting.

The witnesses for the seller interests testified that at the meeting in early May the sewer tap-on fee provision was presented, and that while Bruno Pasquinelli initially objected, he subsequently consented since he would have to pay the fee to someone. The seller's attorney testified that at the July 26, 1966 meeting he told Pasquinelli that he had agreed a number of times to pay this fee. It appears that Pasquinelli's attorney approved the final draft of the contract, which included the provision for the payment of the sewer tap-on fee. But, Pasquinelli stated unequivocally that he never agreed to include the payment of this fee in the contract, and that the only changes in the initial contracts to which he consented were those which would have a tax effect on the seller.

In Scott v. Fowler, 130 Ill App 172 (1906), affd 227 Ill 104, 81 NE 34, it was contended that a series of correspondence constituted a complete contract between the parties. The court rejected the contention that there was a completed contract, and stated that under the facts of the case it was clear that the parties contemplated that a formal agreement should be executed by them before they became bound. On page 178, the court stated:

"In B. & O. S. W. Ry. Co. v. The People, 195 Ill 423, the court quotes with approval from the Ameri-

can and English Encyclopedia of Law (vol 7, 2nd ed p 140) as follows: 'Many cases occur where parties negotiating a contract contemplate that a formal agreement shall be drawn up and signed. The question arises, does such a contemporaneous understanding and agreement make the validity of the contract depend upon its being actually reduced to writing and signed. The true rule may be stated in these words: Where the parties make the reduction of the agreement to writing, and its signature by them, a condition precedent to its completion, it will not be a contract until that is done. And this is true although all the terms of the contract have been agreed upon. But where the parties have assented to all the terms of the contract, the mere reference to a future contract in writing will not negative the existence of a present contract.' "

In El Reno Wholesale Grocery Co. v. Stocking, 293 Ill 494, 127 NE 642 (1920), the court, in holding that the complete execution of a formal agreement was required under the facts of the case before the contract could be considered binding, stated at page 501 "that the question resolves itself into a determination of the intention of the parties as to whether or not the preliminary negotiations should be considered a contract or whether the contract should not be considered binding until formal agreement had been drawn and executed." Also see: 17 Am Jur2d, Contracts, §§ 23–25.

In the case at bar, the parties had the benefit of a more formal document than a series of letters. They also took steps to implement the intended development, but throughout, it was intended that a final contract, to which all parties assented, would be executed to evidence the obligations of each to the other. We believe that this was intended as a condition precedent to the agreements taking effect, and to each party becoming bound to the other

393

in the series of events that was to follow in this transaction.

As we have said before, the agreements signed on April 21, 1966, were silent as to the sewer tap-on fees although they expressed the obligation of the parties as to the water tap-on fees. The question of the sewer tap-on fees was not an insignificant part of the transaction, as is evidenced by this dispute, and the testimony of Bruno Pasquinelli that it involved approximately $40,000, and that in his opinion the seller was attempting to add this amount to the purchase price by means of the tap-on fee. As detailed as the contract provisions were on the various conditions of sale, the subdivision improvements and development, and as specific as they had to be in view of the complexities of the transaction, it is inconceivable that the parties did not intend that the obligations of each as to the sewer tap-on fees would be spelled out in their final contract.

The absence of the provision does not suggest what the obligation might be as to this fee, unless the somewhat artificial presumption is made that the purchaser was to pay this fee because of the presence of the contract provision relating to water tap-on fees. But, it is just as inconceivable that the parties, who had meticulously covered so many and varying details, would intend that this important matter should be resolved by not referring to it. Nor, does it seem likely that the purchaser would assume liability for such fees without determining their limit.

If a binding contract is to come into being—other than a contract implied in law or quasi-contract—it is essential that the parties to the agreement have a meeting of the minds, and that they truly assent to the same things in the same sense on all of its essential terms and conditions. Bailey v. Eater, 53 Ill App2d 37, 42, 202 NE2d 656 (1964) ; 12 ILP, Contracts, § 31.

In at least two respects, we believe that the parties failed to have a meeting of the minds on items essential to this transaction. First, under the unusual and somewhat premature manner in which these agreements were partially executed, we deem it essential to the formation of a contract, that the parties understood and agreed to the extent to which these documents could be changed, added to, and otherwise modified in their finalization. The circumstances strongly suggest that the purchaser did not assent to adding any additional terms to the instruments; and that the only changes to which he assented were those which would have tax consequences for the seller but no other effect on the contracts as they then existed. The seller, however, intended that the matters which had not been finalized should, and would, be completed in the executed documents, even if it meant including provisions and conditions not covered in the existing documents.

In the second respect, we believe that the contract, as written, did not effectively provide for the obligation of payment for the sewer tap-on fee. The seller intended that the purchaser should be responsible for this fee; and the purchaser intended the opposite. Neither had any real basis in the contract documents to support his position; it was left uncovered. We conclude from all of the circumstances that there was no meeting of the minds on this essential matter.

To summarize, there is little agreement in the record before us as to what was said and agreed upon at the various meetings between the parties. Under such circumstances, it is difficult to conclude exactly what the parties agreed to. However, it seems fair to conclude that they did intend that a subsequent document would be the one which would finalize and bind the parties. We conclude this, not only from the testimony of the parties as to what was said at the April 21, 1966 meet-

ing, but from the nature of the meeting, its length, the numerous matters that had to be covered and changed at that time, the form of the agreements at the end of the meeting, the hour that it ended, and the apparent haste or anxiety on the part of the purchaser to get something signed before he left on vacation.

 As to the tap-on provision itself, it appears from the record that the purchaser's attorney did approve the final contract with this provision in it. The seller apparently thought from what was said at the meetings, or perhaps from what was said or done by the attorney for the purchaser, that the purchaser had assented to this fee. However, we accept the purchaser's testimony—at least insofar as it indicates his intent—that he did not intend to do so. At the same time, we believe that the seller intended this to be a charge to the purchaser, and that the seller thought the purchaser had assented to this fee. There was basis for each to believe as he did, but there was no meeting of the minds. For these reasons, we hold that the parties did not form a binding contract. This issue was presented to the court below, and, we believe that it represents a valid, although not the assigned basis for its decree.

 Assuming that a valid contract did exist, we do not disagree with the holding of the trial court that the subsequent conduct constituted a rescission in that time was expressly of the essence, and both parties had failed in some manner in their performance. Under such circumstances, neither party would be entitled to specific performance, and a rescission, not a forfeiture, would occur. Under a rescission, the parties would be restored to their original positions. Neither specific performance nor a forfeiture may be declared until such time as the moving party has complied with all of the provisions of the contract. Horan v. Blowitz, 13 Ill2d 126, 131, 148 NE2d 445 (1958); O'Malley v. Cummings, 86 Ill App2d 446, 452, 229 NE2d 878 (1967).

■ The defendants also contend they were denied procedural due process by virtue of the fact that they were not afforded sufficient notice by the pleadings to apprise them of the issues which they were called upon to defend. Specifically, they argue that the issue of rescission was raised only in Green's counterclaim, which was filed after the trial had commenced. When we view the mass of pleadings, it is apparent that the material facts essential to a finding of rescission were alleged in the answer to the third-party complaint, i. e., the failure of the third-party plaintiff to deposit the funds as required by the contract. The issue of performance was raised well in advance of trial. The legal issue of whether the failure of performance was sufficiently substantial to support rescission was raised within ample time to afford the defendants an opportunity to defend. A fundamental requisite of procedural due process is that every man shall have the protection of his day in court and the benefit of an orderly proceeding according to established rules and the general law; and that the hearing shall not be arbitrary, but rather, shall afford to him an opportunity to be heard in his defense, and shall assure to him an inquiry on the issues of the case wherein judgment is rendered only after trial. There must be an intrinsic fairness of procedure by which a judgment or decree is rendered. Pettigrew v. National Accounts System, Inc., 67 Ill App2d 344, 351, 213 NE2d 778 (1966). We believe there was such fairness in this case.

■ We find no merit to the defendants' contention that they were also denied procedural due process by reason of the court's refusal to admit certain evidence from a particular bank's records, or the manner in which records were obtained from Mr. and Mrs. Andermann. The particular bank records were not relevant to the issues; and in any event, the bank officer was subsequently examined at length by the counsel for the defend-

ants as to these same matters. We find no prejudice from these rulings of the court.

The defendants also contend that they were denied a jury trial to which they were entitled. They had filed a jury demand with their answers. They contend that the trial court had power to disregard the jury demand as to the original chancery proceeding, but that under Counts II, III and IV of their third party complaint, wherein money damages were sought, they were entitled to a jury trial.

On July 18, 1967, an order was entered setting the cases for trial on August 21, 1967; on August 16, 1967, an order was entered continuing the trial to September 7, 1967; on September 6, 1967, an order was entered consolidating the cases and setting them for trial on October 23, 1967; on November 3, 1967, an order was entered setting the case for trial on December 18, 1967; on the last mentioned date the case came on for trial, but the judge was ill and the case was placed on a standby basis for trial at such time as the judge returned.

On each of these occasions, the case was set for trial before a judge without a jury, without any objection. Counts II, III and IV, upon which the defendants rest their right to a jury trial, were not even filed in this case until more than two weeks after the proofs were closed. It has long been the law that the right to a trial by jury may be waived by a party proceeding to trial before the court without objection. The People v. Czaszewicz, 295 Ill 11, 15, 128 NE 739 (1920); Williams v. Frank, 85 Ill App2d 85, 86, 229 NE2d 408 (1967). The conduct of the defendants in this case constituted such waiver.

The defendants complain that it was error for the trial court to include a declaration of property rights in the decree. We find no merit to this contention. In rendering a declaratory judgment, as sought by the

pleadings in this action, the trial court may grant consequential relief, and it should grant such relief as it finds necessary and proper to the determination of the controversy before it. Andrews v. City of Springfield, 56 Ill App2d 201, 216, 205 NE2d 798 (1965) ; Koziol v. Village of Rosemont, 32 Ill App2d 320, 329, 177 NE2d 867 (1961).

■ Also, the defendants claim that it was error for the trial court to dismiss Counts II, III and IV of their third-party complaints wherein money damages were sought. First of all, our holding that there were no valid, binding contracts—which requires an affirmation of the decree of the trial court to the same extent as did the trial court's finding of rescission—supports the dismissal of the counts seeking money damages for the breach of contract, fraud, misrepresentation, conspiracy and interference with the contracts. Secondly, we further believe that the trial court properly dismissed these counts in that they raised entirely new and different issues and matters, wherein money damages were sought, and that they were not filed until two weeks following the end of the four-week trial.

■ The defendants also complain of the trial court's refusal to grant them relief under section 41 of the Civil Practice Act (Ill Rev Stats 1969, c 110, par 41), which provides for the payment of fees and expenses incurred by reason of allegations of another party, made without reasonable cause, not in good faith, and found to be untrue. Both parties to this litigation had filed such motions. The trial court fully considered and denied these motions. We agree that some of the pleadings might have been more precise than they were, but we are satisfied that the trial court could correctly find that neither party acted in bad faith and without reasonable cause with reference to the allegations made in pleading their case. Accordingly, the trial court should be affirmed as

399

having properly exercised the discretion it possesses in this respect. Horween v. Dubner, 68 Ill App2d 309, 319, 320, 216 NE2d 288 (1965) ; Dean v. Kirkland, 301 Ill App 495, 509, 510, 23 NE2d 180 (1939).

For the reasons set forth above, the decree of the trial court is affirmed.

Decree affirmed.

ABRAHAMSON and SEIDENFELD, JJ., concur.