MELVIN R. LUSTER *et al.*, Plaintiffs and Counterdefendants-Appellees-Cross-Appellants, *v.* R. ALDEN JONES, Defendant and Counterplaintiff-Appellant-Cross-Appellee.

First District (5th Division)   No. 77-82

Opinion filed April 6, 1979.

1020

Edward T. Joyce, Ltd., of Chicago (James P. Chapman, Ltd., Ross, Hardies, O'Keefe, Babcock and Parsons, and William J. Harte, Ltd., of counsel), for appellants.

Jenner and Block, of Chicago (Rodney D. Joslin and Robert A. Spanner, of counsel), for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

Melvin R. Luster, Irving J. Lewis and Harold E. Friedman filed a complaint against Raymond A. Jakwerth, a condominium unit owner, seeking to foreclose a lien for his share of the unpaid common expenses at 247 East Chestnut Condominium. Thereafter, on behalf of himself and others similarly situated (Owners) Jakwerth filed a counterclaim against Luster and Friedman (Developers) d/b/a Luster, Friedman & Company (LF) and 247 East Chestnut Properties,[1] seeking injunction and other relief on the basis of the following legal theories: (1) the Developers' violation of section 22 of the Illinois Condominium Property Act (Ill. Rev. Stat. 1973, ch. 30, par. 322) due to their misrepresentations of and failure to disclose accurate estimates of operating expenses to prospective purchasers prior to the sale of each condominium unit, and the subsequent unilateral increases of monthly maintenance charges and levy of special assessments without authorization from the unit owners, (2) the Developers' misrepresentation of existing material facts constituting common law fraud, and (3) the Developers' violation of the Illinois

---

[1] Northwestern Life Insurance Company, a joint venturer with Luster-Friedman & Co., in the development of 247 Chestnut is also named as a party to this appeal.

Antitrust Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—1 *et seq.*) by tying the purchase of a condominium unit to the acceptance of LF as management agents of the building. Subsequently, the countercomplaint was certified as a class action and the counterclaim was amended *inter alia* to request punitive damages and rescission of the purchase agreements. R. Alden Jones, an owner of two units in the building, was later substituted for Jakwerth as class representative. The Developers filed a motion for summary judgment with respect to the alleged violations of the Illinois Condominium Property Act and the Illinois Antitrust Act. After a hearing, the trial court granted summary judgment for the Developers on the antitrust claim and the case proceeded to trial on the remaining issues. At the conclusion of the Owners' case the court granted the Developers' motion to strike all individuals from the class who had not responded to certain interrogatories.

At the conclusion of the trial, the court entered a decree which provided *inter alia*:

"Upon trial of the issues, this Court having considered the testimony of all witnesses and the exhibits and memoranda submitted by each party, IT IS HEREBY ORDERED AND DECREED AS FOLLOWS:

1. Counter-defendants, Melvin R. Luster, Harold E. Friedman, Luster, Friedman & Company and Northwestern National Life Insurance Company, shall, within 45 days of this Decree, hire a qualified contractor or contractors to scrape and paint the spandrels and to tuckpoint the 247 East Chestnut Building ("Building") * * *. Counter-defendants * * * shall pay for the scraping and painting of the spandrels and the tuckpointing of the building.

2. Counter-defendants * * * shall call, within 45 days of this Decree, for the election of a Board of Managers at the Building in accordance with the procedures set forth in Article V of the Declaration of Condominium.

3. Counter-defendants, * * * [LF], shall terminate its contract as managing agent for the building within 45 days of this Decree but shall remain in that capacity until a new managing agent for the Building is retained and undertakes its duties. A new managing agent for the Building shall be hired by the Board * * *.

4. Counter-defendants * * * shall pay the following persons amounts [which] * * * were collected from said persons pursuant to the 1973 Special Assessment:
* * *

5. Counter-defendants * * * are hereby enjoined from using the monies collected to date on the 1976 Special Assessment for any

purpose other than the repair of the garbage chute in the Building. * * * Counter-defendants are hereby enjoined from levying any further special assessment for 1976 without the approval of the Board elected pursuant to Paragraph 2 above or 75% of the unit owners.

6. Each member of the counter-plaintiff class shall pay to the condominium account for the Building all unpaid assessments as of the date of this Decree within 45 days of this Decree.

* * *

8. Counter-plaintiffs' prayer for rescission is denied.

9. Counter-plaintiffs' prayer for punitive damages is denied.

10. Counter-plaintiffs' prayer for attorneys' fees is denied.

11. All other forms of relief prayed for by counter-plaintiffs are denied."

In his decree, the trial judge did not delineate the legal basis upon which he ordered this relief, and the record is further devoid of remarks by the trial judge indicating his legal conclusions. The Owners appeal from the decree to the extent it denied them further relief. The Developers cross-appeal to the extent that the decree ordered the Owners any relief.

Because of our disposition of this matter, we need only address the following issues: (1) whether the Owners were entitled to relief under section 22 of the Condominium Property Act (Ill. Rev. Stat. 1973, ch. 30, par. 322), (2) whether the Owners were entitled to relief under common law fraud principles, (3) whether the Owners were properly certified as a class for purposes of this action, (4) whether the trial court erred in granting summary judgment in favor of the Developers on the antitrust claim. We affirm in part, reverse in part, and remand this cause for further proceedings. The relevant facts follow.

## THE OWNERS' CASE

Melvin R. Luster was called as an adverse witness under Section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1975, ch. 110, par. 60.) He testified that Northwestern Life Insurance Company owned the 247 E. Chestnut Building for the 2 or 3 years prior to its conversion. Percy Wilson managed the building during this period while it operated as a rental building. On April 1, 1972, LF formed a joint venture with Northwestern Life Insurance Company for the purposes of converting 247 E. Chestnut to a condominium.

Luster was responsible for the final draft of the projected operating budget which he and the accountant prepared. The budget was prepared in November of 1972 and was based on data he received from the previous management and LF's 6-7 month history with the building. The building was converted on July 1, 1973 and the purchasers received the

projected budget by the time that their units closed. The figures on the budget were not changed between October or November of 1972 and June 30, 1973, the day before conversion.

As of October 1972, the employees' union contract had expired and Luster prepared the payroll figure on the basis of one janitor's helper although historically, the building utilized two such employees. A new labor contract was negotiated in April of 1973 and by its terms operated retroactively to December of 1972. After the new contract was negotiated, Luster did not revise the payroll figures prior to closing. However, subsequent to closing, he wrote a letter to the unit owners that payroll costs would have to be increased due to a union regulation requiring the addition of another employee.

The figure for fuel was based on the history of the fuel cost for the building. The cost of fuel began accelerating after July 1, 1973. He discussed the fuel cost with their supplier, Ogden Oil Company, in October of 1972 and was assured that there was no need for additional increases. He did not contact them regarding this matter after October and the cost of fuel increased slightly in April or May of 1973.

The projected garage and laundry income of $7,100 was predicated upon a garage lease that was entered into in April of 1972 pursuant to which the garage operator was to pay $500 per month. The anticipated laundry income was $1100 per year. The garage operator paid $500 through October of 1972. At that time he asked forbearance until conversion of the building since he was losing money. Luster agreed but did not notify the purchasers of this arrangement. No income was received from the garage operator for the entire year of 1973, including the six months after conversion. Laundry income totalled $362 for the year.

Luster did not compare the actual costs during the first six months of 1973 to the budgetary figures. There were no monthly operational statements prepared by the accountant during the first six months of 1973. The first time the budget was reviewed was in September of 1973.

The projected repair figure of $2100 was based upon Luster's experience with buildings of similar size and he did not consult with the former management company of 247 E. Chestnut relating to the computation of this figure. Luster testified that an inspection of the water tower of the building between April 1, 1972, and July 1, 1973, disclosed that it would malfunction and a new one was ordered prior to the conversion date. The water tower broke down in July of 1973 and had to be replaced. The new system necessitated higher water costs. The purchasers were not notified of this fact.

The declaration of condominium for the building was offered in May of 1973. Prior to that time purchasers were given declarations from

Ritchie Tower Condominium and were told that the Chestnut declaration would conform in material respects. In the Ritchie Tower declaration LF was named as management company at the rate of $12 per month per unit for the 12-month period following date of sale of 97 units. The 247 E. Chestnut declaration provided for LF to be compensated as management agent at a rate of $15 per month per unit for a period no later than 5 years after the last unit had been sold. Luster did not inform the purchasers of the differences between the two declarations.

The Developer levied a $10,000 special assessment at 247 E. Chestnut in the latter part of 1973. The assessment was allocated on the basis of percentage of unit ownership and the Developer paid the assessment on the units that it still owned. There were increases in monthly maintenance charges in November and December of 1973 and in January of 1974. The Developer neither asked for nor received the Owners' consents for levying the special assessment or increasing the monthly maintenance charges.

When the 1974 operating budget was prepared, an entry was made for elevator fire controls at a cost of $3600. Luster testified that he first learned in the latter part of 1973 that such equipment would be necessary. Judicial notice of a municipal ordinance requiring the installation of fire controls as of January 1, 1973, was taken. A revised operating budget for Ritchie Tower based on the first six months of 1973 was admitted into evidence for the purposes of showing the Developer's knowledge of the ordinance, as it bore an entry of $4200 for the installation of fire controls. The cost of the fire controls for 247 E. Chestnut was borne by the unit owners in 1975.

Luster further testified that he never promised, prior to July 1, 1973, to tuckpoint or paint and scrape the columns and spandrels of the building. To his knowledge, the salespeople did not tell purchasers that tuckpointing would be done. Finally, Luster testified regarding a lawsuit brought by Crown Coin Meter Laundry naming LF as managing agent based on a contract signed prior to April 1, 1972. The case was settled and costs were absorbed by the developer.

Harold E. Friedman testified next as an adverse witness. (Ill. Rev. Stat. 1975, ch. 110, par. 60.) He stated that he was an attorney and a partner in the joint venture and that he prepared the purchase agreement form. The declaration of condominium for 247 E. Chestnut was made available to purchasers on May 17, 1973. Prior to that time, the declaration of condominium for Ritchie Tower was available. Individuals who signed contracts prior to May 17 were told that the declaration of condominium would conform to the one at Ritchie Tower.

Friedman contacted the Cook County assessor to determine how to compute the real estate taxes. However the latter had no knowledge of

how the building would be taxed. Friedman compiled the taxes on the basis of the latest year's tax bill plus a percentage to compensate for any possible increase. He spoke to approximately 40 of the purchasers' attorneys and informed each of them that the tax bill was based upon 247 E. Chestnut, while it operated as a rental building and not as a condominium.

George Bruce testified that he is an elevator inspector for the City of Chicago Department of Buildings. He was responsible for the 247 E. Chestnut building and one of his duties was to check if fire safety controls had been installed. The ordinance relating to fire controls went into effect on January 1, 1973. As of May 1, 1972, a document in his file indicated that a notice was sent to the building. Two other notices were sent by someone else in his department on October 25, 1972, and October 26, 1973. A suit was filed with the Board of Compliance on November 18, 1974. On February 24, 1976, an inspection revealed that a fireman emergency control device had been installed.

Willis L. Helmantoler, Elissa Brown, Roger Feldman, Patrick Duran and Richard Alden, condominium owners at 247 E. Chestnut, testified on behalf of the class members:

Helmantoler testified that he signed an agreement to purchase a unit at 247 E. Chestnut in April of 1973 and moved there in August of that year. Prior to purchasing his unit, Helmantoler and his wife had 2 meetings with sales personnel including Leonard Nanus. In April of 1973 the conversation concerned prices and the improvements to be made in the common areas. He was told that the lobby would be redecorated and the external appearance of the building would be brought into "first-class shape." He was further assured that as a condominium owner, he would have a voice in the management of the building and that LF would cease managing the building as soon as feasible. In a second conversation, he and the sales personnel reviewed the figures and he signed an application. He was told that based on the current tax bill plus a 10% increase, his tax payment would be $112 per month.

In February 1974, he complained to Messrs. Luster and Friedman at a unit owners' meeting that his monthly maintenance costs had been increased from $146 to $203 per month and that a special assessment equal to one month's maintenance charge had been levied without his having any voice. Friedman said that they could increase the monthly charge to a million dollars and that there was nothing he could do about it.

Helmantoler testified during cross-examination that he paid $56,000 for his unit and was allotted $2,000 for decorating. He did not recall seeing a condominium summary. He saw a declaration of condominium which was a model and not the one that would be in effect. His attorney indicated to him that he had reviewed the declaration of condominium.

Nanus wrote a figure of $146 per month on Helmantoler's condominium application which was to include his share of the cost of wages for the doormen and maintenance men, the heat, air conditioning, water, and the management fee. Helmantoler did not ask if this figure would change, and was aware that the figure could increase. However, he was under the impression that it would remain the same for a period of time. His tax bill for the last 6 months of 1973 was $670.48, while the estimate was $682.

Brown testified that she signed a purchase agreement on May 18, 1973, and had been living at 247 E. Chestnut since June of 1973. In her first conversation with salespeople including Nanus on April 14, 1973, she asked whether they would paint the columns on the exterior of the building and she was told that they would. Nanus told her that the building would be put in "first-class condition" and that the figure of $146 per month for maintenance was conservative. In a second conversation she was assured that the building would be tuckpointed. She also noticed a 2 1/2' x 3' sign in the model apartment that the developer would buy back the apartment within two years but she did not inquire about this agreement.

Brown testified that she would not have signed the purchase agreement and/or would have refused to close if she knew that her maintenance charge would be $203 per month as opposed to $146 because she was unable to afford the payments. She further stated that her real estate taxes were $121 per month in 1974 as opposed to $112. She stated that she was represented by an attorney.

During cross-examination, Brown testified that the combined income of her and her husband was $31,000 in 1973. She saw the declaration of condominium from Ritchie Tower and read the document as carefully as she could. She read the purchase agreement and could not recall anything about tuckpointing. She was under the impression that the monthly assessment would remain unchanged for at least a year. She was also aware that after the developer paid for certain items that were promised, all expenses would be absorbed by the unit owners.

She agreed that the condominium summary bore the notation "subject to revision without notice" but she did not ask about it and accepted it in "good faith," as she did the promise concerning tuckpointing.

Feldman testified that he signed his purchase agreement in September of 1972 and closed in July. He had several conversations with salespersons both in their office and on the phone. His first meeting took place in the model apartment where he determined the price and noted the "buy-back" sign if he was not satisfied with the apartment within 2 years. The monthly assessment for his unit was $114 per month and real

estate taxes were $88 per month. He was told that the maintenance charges were based on the actual operating costs of the building. In February of 1974, he telephoned Luster and asked him to repurchase his unit and Luster refused. He further refused to sell the unit as his agent. The monthly assessment had increased to $161 and Feldman testified he would not have closed if he had known that the maintenance charge would be increased to that amount.

During cross-examination, Feldman stated that he did not see the condominium declaration prior to signing the purchase agreement. He assumed that the buy-back agreement was similar to a warranty. He admitted that he was never told, nor did his contract state that the monthly figures would never change.

Duran testified that in his first conversation with sales representatives, he was quoted an assessment of $78 per month and was told that the figure would not change for some time because an additional 10% margin had been included. He was also told that there was a reserve contingency fund to fix unforeseen problems. A tax figure of $60 per month was given him, based upon the 1972 quadrennial assessment which he was told had just been made and would not go up for 4 years.

He was also told that the hallways would be redecorated, the elevators and foyer refurbished and that repairs would be made to the outside of the building including the columns. He was told that there was a $7,000 per year income from the garage and he was also aware of the repurchase guarantee sign.

In November of 1973, he attended a meeting where Luster mentioned the refurbishment and promised to paint the columns and spandrels of the building. One of the Owners asked if tuckpointing would be done and Luster explained that tuckpointing would have to be done before painting. Duran testified that if he knew his assessments would be $109 instead of $78, he would not have purchased the unit.

During cross-examination, he stated that he did not recall the "price subject to change without notice" provision. In 1974 he paid $60.73 per month in taxes as opposed to the projected $60 per month. He was represented by an attorney and never tried to rescind prior to closing. Duran further admitted that in his purchase contract he inserted a provision regarding installation of various appliances and carpeting but failed to incorporate the repurchase agreement.

Jones, an architect, testified that he owned two units in the building. He was given a deduction on the purchase price for doing his own improvements and was given a credit in lieu of the buy-back agreement. He was told that the building would be put in "first-class condition" and that the lobby would be repaired prior to closing. He asked and was told

that the Developer would paint the exterior and tuckpoint "as necessary." He also was given the Ritchie Tower declaration, a projected budget, and was told that the taxes were based on the current bill plus 10%. He was further told that LF would manage for only a year or so because it was basically a developer and had no desire to manage the building.

In October of 1973 he met with Luster and Friedman and told them that the unit owners had formed an association. They agreed to furnish him a statement of operating costs but at the end of the month were told that such statement was not available. At a meeting on November 5, 1973, the Developer indicated that it would complete the decorating of the common areas and would repair and paint the columns and spandrel at its expense. Jones corroborated Duran's account of the Developer's indication that tuckpointing would have to be done before such repairs.

On December 30, 1973, several Owners expressed concern at a meeting about the 60% increase in monthly assessment and the levy of the special assessment. A suggestion was made regarding a self-park garage and a reduction in the number of doormen. At two subsequent meetings in early 1974, LF refused to furnish a copy of the management agreement and refused to resign and allow the Owners to form their own official board.

Jones testified that on one of his units he was paying $161 instead of $114 per month and the other $109 instead of $78. If he had been aware of the forthcoming increase he would not have closed on either unit. During cross-examination, Jones admitted that he sent a letter to LF on December 23, 1973, that in his opinion the building did not need tuckpointing. He also testified that he did not try to rescind prior to closing.

Jay Schultz, Robert D. Cox, and Robert D. Maher each testified that they were attorneys who represented individuals who purchased units in the building. They each testified to the effect that Friedman did not inform them that the tax bill was based on 247 E. Chestnut while it operated as a rental building and not a condominium.

The Owners called Dennis G. Kenny, a licensed C.P.A., as their accounting expert. He reviewed the books and records of 247 E. Chestnut for the first six months of 1973, the period immediately preceding the building's conversion to condominium and also from July 1, 1973, to December 31, 1975. His purpose in examining the books was to determine whether the projected operating budget for 1973 was reasonable in light of the historical data available and to make sure that the expenses incurred prior to July 1, 1973, were picked up by the Developer.

In his opinion certain items were improperly charged to the condominium's common account by the Developer including borrowing

$1,000 to settle a lawsuit and paying it back four months later without interest, and paying on an insurance policy which covered, in part, loss of rents, a benefit only available to the Developer. He testified to a few other expenses that he thought should have been paid by the Developer, but during cross-examination it was established that most of these items were properly disbursed.

Kenny further described the method he would utilize in preparing the budget and concluded that the 1973 projected operating budget was neither reasonable nor realistic in light of the actual expenditure and experience of the building for the period from January 1, 1973, through June 30, 1973. During cross-examination, he admitted that he had never prepared a budget for a condominium.

## THE DEVELOPERS' CASE

Nathan Miller was called and was duly qualified as the Developers' accounting expert. He testified that he examined the records of 247 E. Chestnut to (1) see if the 1971 disbursements incurred by Percy Wilson Management served as a basis for the 1973 projections and to (2) determine the factors that contributed to the variance between the actual expenditures for the second half of 1973 as compared to the projections. He concluded that the projected budget for 1973 was reasonable in light of the 1971 data available.

Luster testified in his own behalf that he had converted six or seven buildings to condominiums prior to the conversion of 247 E. Chestnut and that LF had operated as the management of these buildings. Prior to 1972, the approximate annual increase in condominium expenses was 5% per year while in the latter part of 1973, there was an acceleration in operating costs. The 1973 projected budget was prepared and formalized in October of 1972 based on the records sent by Percy Wilson Management Company during 1971. Luster acknowledged that the distributed budget was entitled "1973 Projected Operating Cost based on 1972 Operation and Changes." He explained that at the time the budget was prepared, LF had only 6 months history with the building. Thus, they had to rely on operating costs other than those based on their 6 month experience and utilized the 1971 data supplied by Percy Wilson.

Between October of 1972 and July of 1973 thousands of dollars were expended by the Developers updating the equipment and renovating the units. Luster further reiterated the substance of his testimony during the Owners' case concerning the elimination and reinstatement of an engineer's helper, and his grant of forbearance to the garage operator.

Luster further testified that he had lunch with their fuel supplier approximately once a month and that he always inquired as to the outlook

in fuel costs. There was an acceleration in fuel usage in the latter part of 1973 due to the installation of the new water tower.

In October of 1973, LF conducted its first review subsequent to conversion and found that the building was operating at a deficit. A special assessment of $10,000 was levied on December 1, 1973.

In November of 1973 the Developers agreed to paint the spandrels if the unit owners would pay their assessment. The unit owners did not comply. The Developers never promised to tuckpoint. Additionally, the Developers supplemented the garage operation for a period of time to keep the garage going, and reimbursed the Owners' account for the $2,950 expended for the installation of fire controls in December of 1975. He also stated that no unit owner ever tendered his unit back to him for repurchase.

Leonard Nanus testified that he was the sales manager for LF during the period before conversion, but was not usually involved in sales presentation. He left LF in April of 1975. He did not recall telling Brown or Helmantoler that the building would be put in first class condition and never said that the Developers would tuckpoint the building or paint the exterior. During cross-examination, Nanus admitted that he still worked for LF on a part time basis at another building and is compensated with a rent-free apartment. During 1972 and 1973, he was in charge of at least four different buildings.

Marshall Ginsberg testified that he was employed by LF for one year. An accountant, he prepared the projected budget for 247 E. Chestnut. During cross-examination he stated that he left LF in April 1973. The budget in evidence was not the precise budget that he prepared. Upon redirect, he stated that the title was different and the total was different.

OPINION

As a threshold matter, we must decide whether section 22 of the Illinois Condominium Property Act (Ill. Rev. Stat. 1973, ch. 30, par. 322) is applicable to this case. We hold that it is not.

Section 22 provides *inter alia*:

"In relation to the initial sale or offering for sale of any condominium unit, the seller must make full disclosure of, and provide copies to the prospective buyer of, the following information relative to the condominium project:

(a) the Declaration;

(b) the Bylaws of the association;

(c) a projected operating budget for the condominium unit to be sold to the prospective buyer, including full

details concerning the estimated monthly payments for the condominium unit, estimated monthly charges for maintenance or management of the condominium property, and monthly charges for the use of recreational facilities; and

\* \* \*

All of the information required by this Section which is available at the time shall be furnished to the prospective buyer before execution of the contract for sale. Thereafter, no changes or amendments may be made in any of the items furnished to the prospective buyer which would materially affect the rights of the buyer or the value of the unit without obtaining the approval of at least 75% of the buyers then owning interest in the condominium. *If all of the information is not available at the time of execution of the contract for sale, then the contract shall be voidable at option of the buyer at any time up until 5 days after the last item of required information is furnished to the prospective buyer, or until the closing of the sale, whichever is earlier. Failure on the part of the seller to make full disclosure as required by this Section shall entitle the buyer to rescind the contract for sale at any time before the closing of the contract* and to receive a refund of all deposit moneys paid with interest thereon at the rate then in effect for interest on judgments." (Emphasis added.)

In *Johnson v. Nationwide Industries, Inc.* (N.D. Ill. 1978), 450 F. Supp. 948, the Federal court for the Northern District of Illinois considered the applicability of this statute in resolving a claim similar to the one presented here. There, plaintiffs, condominium owners, alleged violations of the Illinois Condominium Property Act based upon the failure of the selling defendants to "provide accurate information concerning the projected operating budget and monthly assessments of the building, the extent of the building's indebtedness, and the terms of the garage lease and management contract to the plaintiffs prior to the closings of their purchases." (450 F. Supp. 948, 954.) There, as here, the suit arose subsequent to the closing of the condominium units. The court held:

"Since all the plaintiffs in the case at bar have long since completed the closings of their condominium purchases, the relief available through this statute is simply not applicable. Plaintiffs argue that, even though it is true that the statute purports to provide for only the relief of rescission of the contract of sale prior to final closing and even though there is no reported Illinois case law saying the act allows any other kind of relief, we should take cognizance of a certain ruling by the Circuit Court of Cook

County, not recorded in a written opinion, but currently pending on appeal to the Illinois Appellate Court for the First District, in which the court did grant other kinds of relief. But the statute is clear on its face; a federal court should not, and we will not, accept this invitation to shape state policy by means of the dramatic expansion of remedy urged here. The motions to dismiss are therefore granted * * *." 450 F. Supp. 948, 954.

■■ We find the Federal court's reasoning persuasive and also decline the invitation to expand the remedy afforded under the statute as this is a matter best left to the legislature. As the statute is now written, the remedy afforded to the condominium purchaser is a limited one. The remedy of rescission due to the seller's failure to disclose is provided to the prospective buyer only as a remedy prior to closing. As the class members in the instant case brought their suit subsequent to closing, they may not avail themselves of the relief provided by section 22.

As part of the decree in the instant case, the trial judge ordered the Developers to return the 1973 special assessment to members of the class and to return a portion of the 1976 special assessment. Although the trial judge did not delineate the legal basis upon which he afforded this relief, the following language indicates that he was applying the principles of section 22:

"Counter-defendants are hereby enjoined from levying any further special assessment for 1976 without the approval of * * * 75% of the unit owners."

It appears that the judge was utilizing the language of 22 that "no changes or amendments may be made in any of the items furnished to the prospective buyer which would materially affect the rights of the buyer or the value of the unit without obtaining *the approval of at least 75% of the buyers then owning interest in the condominium.*" (Emphasis added.) Again, this portion read in conjunction with the remainder of the provision dictates a finding that it is only applicable to the period prior to closing and may be utilized as a device by the seller who wishes to amend the information he gives the prospective purchaser. The use of the term "prospective purchaser" confirms our interpretation that this applies to the preclosing period.

Having concluded that section 22 is inapplicable to the instant case, we hold that any award of damages based upon this provision was erroneous and that portion of the decree must be reversed. Notwithstanding our holding that the Condominium Property Act is inapplicable, we hold that the Owners may be entitled to a different measure of damages based upon their claim of common law fraud.

The record is silent as to the trial judge's finding with respect to the Owners' claim of fraud. The fact that the trial judge denied the "fraud

type" relief including the prayers for rescission, punitive damages, and attorneys' fees does not really guide us since it is possible that he merely believed that the Developers were not acting with malice or in bad faith. ██ "A misrepresentation in order to constitute a fraud must consist of a statement of material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on the truth of the statement." (*Roth v. Roth* (1970), 45 Ill. 2d 19, 23, 256 N.E.2d 838, 840.) There are several contentions presented that, if true, would sustain the Owners' action based upon common law fraud. Among the most glaring of the Developers' misrepresentations of material fact are the distribution of a budget based primarily on 1971 figures that was entitled "1973 projected operating cost based on 1972 operations and changes," computation of a payroll figure on the basis of one janitor's helper instead of the required two, overstatement of income from the garage, failure to disclose the forbearance given the garage operator, and the distribution of a materially different condominium declaration upon which purchasers were led to rely. Nevertheless, as a reviewing court we are reluctant to rule at the present juncture for there are not relevant findings before us. If we resolved the fraud claim, we would be sitting as the trier of fact and we are not in the best position to determine the credibility of the lay and expert witnesses who testified.

We note that this is not a situation where we as the reviewing court could disregard any erroneous reasoning by the trial court and affirm the judgment as long as the record reflected that the underlying result was the correct one. (*Donow v. Board of Trustees* (1974), 21 Ill. App. 3d 139, 314 N.E.2d 704; *Geist v. Lehmann* (1974), 19 Ill. App. 3d 557, 312 N.E.2d 42; *La Salle National Bank v. International Limited* (1970), 129 Ill. App. 2d 381, 263 N.E.2d 506.) There must be a legally sufficient ground upon which to support a judgment. (*Owen v. Pret' A Porter Boutique, Inc.* (1973), 15 Ill. App. 3d 438, 302 N.E.2d 672.) The record before us suggests that the trial judge erroneously applied the precepts of the Condominium Property Act and refrained from deciding on the common law fraud count. The present award of damages cannot be justified upon any legal principle.

██ We therefore remand this issue so that the trial court may make explicit findings regarding fraud. If necessary, the trial court may receive new evidence. If the trial judge finds that fraud has been proven, he is directed to recompute the damages in accordance with any finding of fraud.

██ We next turn to the Developers' contention that this case was improperly certified as a class action since there were individually negotiated transactions and therefore individual questions of reliance on the allegedly fraudulent misrepresentations predominated over the

common questions of law and fact. We hold that the trial court's finding in this regard was not against the manifest weight of the evidence.

Our supreme court's recent decision in *Steinberg v. Chicago Medical School* (1977), 69 Ill. App. 2d 320, 371 N.E.2d 634, has mitigated the long-standing problem of proving reliance in class action cases based upon fraud, as long as the other requirements of the class action statute are met. In *Steinberg*, plaintiff sued on behalf of himself and others similarly situated to recover the application fees paid to Chicago Medical School based, in part, upon the distribution of a medical school catalogue which contained allegedly fraudulent misrepresentations. The court stated:

> "So long as there are questions of fact or law common to the class and these predominate over questions affecting only individual members of such class, the statutory requisite is met. It would be needless to consider the variations in our case law on this aspect. With the advent of the statute many of the prior decisions have become corpses.
>
> It is, of course, well established that the elemental determination that some members of a class are not entitled to relief because of some particular factor will not bar the class action. *Rosen v. Village of Downers Grove* (1960), 19 Ill. 2d 448, 456." 69 Ill. 2d 320, 338, 371 N.E.2d 634, 643.

In this case, the common questions of fact and law predominate over the questions affecting only individual members of the class. All members received the declaration of condominium from Ritchie Tower and were told that their own declaration would conform in material respects. In fact, the declaration of condominium for 247 E. Chestnut provided for a lengthier and more costly management contract. All members of the class received a budget that included a materially understated payroll figure and an overstated income figure. All members received a projected operating budget for 1973 based upon 1971 figures. Although there is some dispute as to whether all members including the class representative received the mistitled budget, this is a matter for the trial judge to determine upon remand of this cause and will not bar the maintenance of a class action.

As stated by the court in *Steinberg*:

> "An Illinois court determining that an essential element of the proof is common to only certain members of the class could order separate trials on that particular issue. (Ill. Rev. Stat. 1975, ch. 110, par. 23.) Or the class could be broken into various subclasses, as the Federal decisions point out. The class action, however, is not to be dismissed because of these differences in elements of proof between members of the class." 69 Ill. 2d 320, 342, 371 N.E.2d 634, 645.

We next consider whether the trial judge erred in granting summary judgment in favor of the Developers on the issue of whether the Developers violated section 3 of the Illinois Antitrust Act (Ill. Rev. Stat. 1971, ch. 38, par. 60—3) by tying the purchase of a condominium unit at 247 E. Chestnut to the acceptance of the management services of Luster Friedman.

A tying arrangement is defined as an agreement by a party to sell one product but only on the condition that the buyer also purchase a different product. (*Maywood Sportservice, Inc. v. Maywood Park Trotting Association, Inc.* (1973), 14 Ill. App. 3d 141, 302 N.E.2d 79.) It is necessary that the two products be distinct or they are incapable of being tied. (*American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.* (S.D. N.Y. 1963), 221 F. Supp. 848.) A tying arrangement is *per se* illegal when:

> "* * * a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pacific Ry. Co. v. United States* (1958), 356 U.S. 1, 6, 2 L.Ed. 2d 545, 550, 78 S. Ct. 514, 518.

Since tying arrangements are generally tested by the standards of section 3 of the Clayton Act (15 U.S.C. §14 (1976)) and Illinois has no counterpart to that section, Illinois courts generally employ a "rule of reason" test under section 60—3(2) of the Act (Ill. Rev. Stat. 1971, ch. 38, par. 61—3(2)). Under the rule of reason, the court must consider the actor's purpose in entering into the arrangement, the nature of the conduct, the effect on the industry and the competitive climate within the industry. *Blake v. H-F Group Multiple Listing Service* (1976), 36 Ill. App. 3d 730, 345 N.E.2d 18.

In *Jones v. 247 E. Chestnut Properties* (1975), Trade Cases §60, 491 (CCH), the Federal District Court for the Northern District of Illinois considered a similar contention involving an alleged violation of the Sherman Antitrust Act and the Illinois Antitrust Act. *Jones* involved the same defendants, the same condominium, the same alleged illegality by LF and was brought by the named class representative in an individual capacity. There, as here, the Developer made a motion for summary judgment on the antitrust issue. In addressing this issue, the court utilized both the *per se* and rule of reason approaches. The court considered the first requirement of illegality and concluded that "management services and condominiums are generally different products." The court stated:

> "Plaintiff in the present case alleges that, as part of the purchase agreement for a condominium unit, the purchaser was 'required to

accept and pay for the management services of Friedman for a period exceeding five years after the date that the last unit was sold' (Amended Complaint p. 15), and that as a result of this arrangement they were forced to pay management fees far exceeding the fees charged by other building management firms providing comparable services. Management services and condominium units are certainly separate products here and plaintiff's uncontested allegation makes out a claim under sections 1 and 2 of the Sherman Act. Whether the requirement running for the period here involved is reasonable cannot now be determined. The Court recognizes the problem posed by defendants regarding the provision of managerial services to condominium purchasers, but we agree with the plaintiff that the impracticability of allowing each owner to choose a management firm is overcome by the feasibility at some point of a collective choice by the owners with respect to the management of the building."

The court also decided that:

"The issue of whether an insubstantial portion of interstate commerce has been foreclosed by this arrangement similarly cannot be answered at this point. The *Fortner* Court (*Fortner Enterprises v. U.S. Steel* (1968), 394 U.S. 495, 22 L. Ed. 2d 495, 89 S. Ct. 1252) indicated the correct figure to be considered in determining substantiality:

'. . . the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit.' 394 U. S. at 502. In *Advance Business Systems and Supply Co. v. SCM Corp.* [1969 Trade Cases par. 72, 880], 415 F. 2d 55 (4th Cir. 1969), the court, citing *Fortner*, held that $7,000,000 of copying paper was clearly a substantial volume of commerce. In *International Salt Co., Inc. v. United States* [1946-1947 Trade Cases par. 57, 635], 332 U. S. 392 (1947), the Supreme Court held that $500,000 was a substantial amount of interstate commerce. In *Fortner, supra,* the Supreme Court held that $190,000 was not an insubstantial amount of interstate commerce."

Consequently, the court held:

"The evidence adduced to facilitate the ruling on summary judgment motions in the instant case does not indicate the total dollar volume of managerial services foreclosed by the instant tying arrangement. Nor does it indicate the extent, if any, to which interstate commerce generally is or may be affected. Accordingly, the defendant's motion for summary judgment on the Sherman Act count is likewise denied."

██ Similarly, we hold that the trial judge's grant of summary judgment in the instant case was in error. A genuine issue of material fact exists here as to the effect of the tie on the management service market in Chicago, a definition of the relevant market involved, the reasonableness of the terms of the management contract here, and the reasons for LF's imposition of the tie. Having concluded that triable issues exist, we hold that it was error for the trial court to grant summary judgment, and we reverse and remand for a trial on this matter.

██ The Owners also contend that it was error for the trial judge to dismiss certain members of the class for failure to respond to interrogatories. Although this was an appropriate sanction at the time it was ordered as the class members had not complied with discovery orders as of the eve of trial, the reason for this sanction no longer exists. Since a trial has been ordered on the antitrust issue, and the receipt of new evidence is also being allowed on the fraud issue, we deem it appropriate to reinstate those members of the class, provided that it is proved that they share in the common questions of law and fact presented.

██ Finally, we affirm that portion of the decree which ordered the Developer to tuckpoint at its own expense. Apparently, the trial judge believed the Owners' testimony that the Developer undertook to do so as part of its contract. We cannot say that his finding is against the manifest weight of the evidence.

For the foregoing reasons, we reverse the portion of the decree ordering the return of the 1973 and 1976 special assessments as they evidence the trial court's utilization of section 22 of the Condominium Property Act. We remand on the fraud issue for the trial court to make explicit findings, receive new evidence, and recompute the damages if it finds in favor of the Owners. We further reverse the order of summary judgment on the antitrust count and remand for a trial on that issue. We direct that the members of the class who were dismissed be reinstated, subject to proof of their interest in the common questions of law and fact presented. Finally, we affirm that portion of the trial court's judgment ordering tuckpointing at the Developers' expense.

Affirmed in part, reversed in part, cause remanded.

LORENZ and MEJDA, JJ., concur