MAYWOOD SPORTSERVICE, INC., Plaintiff-Appellee, *v.* MAYWOOD PARK TROTTING ASSOCIATION, INC., Defendant-Appellant.

(Nos. 55978, 56266 cons.;

First District (3rd Division)—August 2, 1973.

Theodore A. Groenke and Gary L. Prior, of McDermott, Will & Emery, of Chicago, for appellant.

William T. Kirby and John N. Tierney, of Hubachek, Kelly, Rauch & Kirby, and Edward J. Kelly, of Coburn & Kelly, all of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Maywood Sportservice, Inc., brought this declaratory judgment action against defendant, Maywood Park Trotting Association, Inc. Defendant conducts harness racing meets at Maywood Park, while plaintiff is the concessionaire at the track. Plaintiff sought a declaration that its concessions contract with defendant remained in effect, and that defendant's attempted termination of the contract was null and void. The trial court entered judgment for plaintiff, and defendant appeals. On appeal defendant contends that, as a matter of law, the contract in question had terminated by its own terms; that the contract's standard of performance was so vague and indefinite as to be judicially unenforceable; that plaintiff failed to meet its burden of proving performance; and that, under Illinois antitrust law, the contract was an illegal exclusive dealing or tying agreement.

On February 26, 1946 defendant leased a tract of land which became the track premises. The lease was for twenty years, and was to terminate on December 31, 1965. In 1962 a new lease was made to defendant for the period from January 11, 1966 to December 31, 1985. The lessor named in both leases was Arthur T. Galt. Attached to the second lease was a consent signed by the trustees and beneficiaries of a trust to which Arthur Galt and his wife had deeded the premises in 1949. Both leases contained a provision that defendant "shall be entitled to regard Arthur T. Galt alone as lessor for all purposes."

The 1962 lease contained no reference to the 1946 lease. The 1962 lease included approximately 1,500 feet of land, principally for parking, not included in the 1946 lease. The 1962 lease also excluded a triangular parcel of land, approximately 200 by 80 by 200 feet, which had been included in the earlier lease. Under the 1946 lease, defendant was to pay rent of $35,000 per year, whether or not racing was conducted, plus a per cent rental based on the mutuel handle if racing were conducted. The 1962 lease eliminated any fixed rental payment, and the percentage rental was to be computed differently. Under the 1946 lease defendant was responsible for fifty per cent of the real estate taxes, while under the 1962 lease defendant was responsible for all real estate taxes on the premises. Under the 1946 lease defendant was to pay $125,000 for improvements, while under the later lease defendant was to expend $3,000,000 for improvements on the premises. There were also differences in insurance provisions.

In 1946 a concessions agreement had been made between defendant and Illinois Sportservice, Inc., giving the latter the exclusive right to provide food and concession service at Maywood Park. Two versions of the agreement, varying in their delineations, were introduced at trial by

the respective parties. However both versions provided that the contract was to continue throughout defendant's twenty year lease and:

> "for and during any renewal or extended period or periods of said lease, whether effected through new or substitute leases or by renewal or extension agreements between the lessor and party of the first part (Maywood) or its successors or assigns, provided that the party of the second part (Illinois Sportservice) complies with the terms and conditions of this contract."

Plaintiff at trial introduced into evidence an assignment of this concessions agreement to itself by Illinois Sportservice, Inc. Plaintiff also introduced testimony that it and Illinois Sportservice, Inc. were interlocking corporations, and that both were subsidiaries of Sportservice, Inc.

In 1964 the three sons of Arthur Galt acquired eighty per cent control of the defendant corporation, and proceeded to expend large sums of money to improve the track. On September 22, 1964 plaintiff and defendant entered into a written agreement. This agreement, drafted by plaintiff, eliminated certain provisions contained in the 1946 concessions agreement as being obsolete. The 1964 agreement also added certain new provisions defining the quality of food and services to be provided by plaintiff. Lastly it provided:

> "It is to be understood that except as clarified, amended and/or modified hereunder, the concession lease and agreement dated April 6, 1946, as amended from time to time, shall remain in full force and effect."

Thereafter plaintiff expended over $350,000 in making improvements at the track.

At trial Carmelo Sabatino, a vice-president of the plaintiff corporation, testified that plaintiff had been operating the concessions at Maywood Park for several years.

Robert Jack, an employee of plaintiff's, testified for plaintiff that, subsequent to the agreement entered into by the parties on September 22, 1964, plaintiff's equipment and facilities at the track were remodeled extensively. He described plaintiff's plant and equipment at the track in detail, including its dining room seating 1000 persons, and asserted that its concessions and services were of the finest quality.

Sid E. Anton, defendant vice-president, testified for defendant that he was placed in charge of the race track in August, 1967. He stated that at this time the dining room and concessions were doing poorly and that he had difficulty in getting cooperation from plaintiff in improving the situation by means of promotional enterprises. Anton received many complaints from patrons about the dining room and concessions. He personally observed that "choice" beef was being served in the dining room

while "prime" was being advertised. There was a complete failure of service by plaintiff on the opening night of the fall meeting in 1968. Anton further testified that as a result of this failure and the cumulative shortcomings of the plaintiff's service, on October 25, 1968 he sent a letter to plaintiff informing it that defendant was terminating their concessions contract at the end of the 1968 racing season.

Herman Goldman, another employee of plaintiff, testified on rebuttal that there was a shortage of waiters and failure of service in the dining room on the opening night of the 1968 racing meet. That shortage was caused by union problems and an unexpected party at another race track. The situation was remedied immediately and did not recur. Goldman further testified that thereafter various representatives of defendant expressed complete satisfaction with plaintiff's service.

Evidence was also adduced at trial that in 1968 Sportservice, Inc. and its subsidiaries had concessions contracts at other race tracks in Illinois: Cahokia Downs, Aurora Downs and Hawthorne. At the time of trial, only the contract with Cahokia Downs remained effective. In addition to race tracks, Sportservice, Inc., and its subsidiaries had concessions contracts at White Sox Park, Chicago Stadium, the Chicago Coliseum and Milwaukee County Stadium.

At the close of evidence the trial judge made the following findings of fact and law: that there was a valid assignment of the 1946 concessions agreement by Illinois Sportservice, Inc. to plaintiff; that the agreement granted sole and exclusive catering rights at Maywood Park; that the agreement was to continue through the 20 years of the 1946 lease and during any renewal or extended period or periods of said lease, whether effected through new or substitute leases or renewal or extension agreements between the lessor and Maywood; that on June 20, 1962 Arthur Galt and defendant entered into a new lease for premises including those described in the 1946 lease; that a September 22, 1964 agreement entered into by Arthur Galt, Jr. on behalf of defendant expressly amended the 1946 concessions agreement; that the 1962 lease is a renewal of the 1946 lease within the meaning of the April 6, 1946 agreement and that the parties thereafter were operating under the September, 1964 amendment; that the contract did specify enforceable standards; that there had been no terminable breach of the contract by plaintiff; and that the subject contract was not an illegal tie-in or exclusive dealing contract.

Defendant initially contends that the concessions agreement between the parties expired by its own terms on December 31, 1965 and did not continue through defendant's second lease of the premises. It urges that the parties, premises and conditions contained in the 1962 lease were so different from those in the 1946 lease that, as a matter of law, the 1962

lease could not be found to be renewal or extension of the 1946 lease within the meaning of those terms in the 1946 concessions contract.

■■ The language contained in the concessions agreements of 1946 and 1964 effectively negate the argument that plaintiff's concessions contract expired on December 31, 1965. The 1964 agreement specifically recited that "the concession lease and agreement of April 6, 1946, as amended from time to time, shall remain in full force and effect." The 1946 concessions contract, as we have noted, stated that Sportservice would receive sole and exclusive concession privileges for the twenty year period of the lease and "for and during any renewal or extended period or periods of said lease, whether effected through new or substitute leases or by renewal or extension agreements." The literal, broad and sweeping language of the two agreements could only mean that the 1946 agreement covered a new lease period; that a new lease was executed in 1962, and in 1964 the parties ratified those terms of the 1946 agreement which extended the concession term into the new lease period. In view of that language, changes in the terms of the second lease as to rental, payments of taxes and insurance provisions, could not alter the fact that the second lease was an extension, either as a renewal or as a new lease.

Defendant suggests that it is contrary to reason to think that the parties could have intended to enter into an agreement for so long a period of time. This argument overlooks the fact that the concessions contract had been in effect for over twenty years without complaint by either party. As the trial judge noted, in referring to the extremely broad language of the 1946 agreement, "in substance this contract provides that it shall be in effect so long as Maywood Park Trotting Association has a lease." The validity of such an extended arrangement has been upheld in this state. (*Illinois Central Co. v. Michigan Central Co.* (1958), 18 Ill.App.2d 462, 152 N.E.2d 627.) In this connection, it is interesting to note that in 1965 defendant's auditor in a letter to plaintiff referred to the parties' long term contract.

■■ We find no merit in defendant's contention that the parties did not have an agreement after the end of the first lease because the lessor in the second lease was not the same as in the first lease. It maintains that, because of the 1949 trust arrangement, Arthur Galt was not the actual lessor under the 1962 lease. Both leases specifically named Arthur Galt as lessor, and both leases contained identical provisions that defendant as lessee "shall be entitled to regard Arthur T. Galt alone as lessor for all purposes."

■■ We also hold that the trial court correctly found that both leases referred essentially to the same premises. While contiguous land was added to the second lease, principally as parking area, and while one

parcel was excluded from the second lease, both leases, as shown by the plat of survey introduced into evidence, clearly were concerned with the same premises.

Defendant's second contention is that the standard of performance imposed upon plaintiff under the 1964 concessions agreement is vague and indefinite. It maintains that since there is no enforceable standard for plaintiff's performance, its promise of performance is illusory and the contract is void. The pertinent provision of the 1964 contract states that plaintiff:

> "shall take all necessary precautions so that all articles of food and liquor sold * * * shall be pure, wholesome and of good quality; and food served and services rendered and portions and prices of food and drink shall be comparable to that furnished and rendered at other race tracks similarly conditioned and situated in the State of Illinois."

The terms of a contract must be reasonably certain; and when the material terms and conditions are not ascertainable no enforceable contract is created. (*Lee Shell Co., Inc. v. Model Food Center, Inc.* (1969), 111 Ill.App.2d 235, 250 N.E.2d 666.) However, a contract is sufficiently definite and certain if a court, using rules of construction and principles of equity, is able to ascertain what performance the respective parties have promised. (*Gale v. York Center Community Cooperative, Inc.* (1960), 21 Ill.2d 86, 171 N.E.2d 30.) Also where the obligations of one party to a contract are totally dependent upon its own actions, the contract is void. *Kraftco Corp. v. Kolbus* (1971), 1 Ill.App.3d 635, 274 N.E. 2d 153.

However, "pure, wholesome and of good quality," are not standards within the exclusive control of plaintiff, nor is the standard that service and prices be "comparable" to that of other tracks "similarly situated."

Although these standards have not previously been considered by Illinois courts, other jurisdictions have found the terms here used to be judicially determinable and enforceable. In *Meridian Waterworks Co. v. City of Meridian* (Miss. 1905), 37 So. 927, "pure and wholesome" was found to be an acceptable contract standard. In *J. A. Kirsh & Co. v. Benyunes* (1919), 174 N.Y.S.

■■ Furthermore, as the trial judge aptly noted, courts in condemnation cases are frequently called upon to decide whether a particular piece of property is comparable in value to the property condemned. Difficulty of proof is not to be equated with impossibility of proof. The trial court correctly determined that the standards specified in the 1964 contract were capable of enforcement.

Defendant's third contention is that plaintiff failed to meet its burden

of proof to establish that it had performed its obligations under the concessions contract. It urges that sufficient evidence of performance was not adduced by plaintiff and that the trial court erroneously placed the burden of proof upon defendant. Plaintiff concedes that it had the burden of proving its substantial performance under the contract, but maintains that its burden was met.

A party may terminate a contract only because of substantial nonperformance by the other party so fundamental "as to defeat the objects of the parties in making the agreement." *Wright v. Douglas Furniture Corp.* (1968), 98 Ill.App.2d 137, 143, 240 N.E.2d 259.

■■ Plaintiff introduced ample evidence concerning its satisfactory performance of the concessions contract. Its witness testified as to the fine quality of its dining facilities, concessions and services at the track. Although conceding that service was poor in the dining room on one evening, plaintiff's witness testified that thereafter the food and service were provided to defendant's satisfaction. Photographs of the various facilities and detailed records of its operations at the track were also introduced into evidence by plaintiff. There was sufficient evidence for the trial court to find that plaintiff had performed its obligations under the contract.

■■ Defendant predicates its argument that it was erroneously given the burden of proof at trial on a statement by the trial judge in his holding that "the evidence of the defendant has failed to show a breach of contract by failure to perform as alleged in the third affirmative defense." This statement by the judge in his decision came after he had denied defendant's motion for judgment made after plaintiff rested its case in chief. In our view, an examination of the record reveals that the trial judge recognized plaintiff's burden of proof, and the comment does not reveal that he had improperly shifted the burden of proof.

Defendant's final contention is that the concessions contract is in violation of the Illinois Antitrust Act (Ill. Rev. Stat. 1969, ch. 38, par. 60—3), in that it is an illegal long-term exclusive dealing contract and an illegal tie-in contract.

Section 3 of the Illinois Antitrust Act (Ill. Rev. Stat. 1969, ch. 38, par. 60—3) provides in part:

"Violations—Enumeration

Every person shall be deemed to have committed a violation of this Act who shall:

\* \* \*

(2) By contract, combination, or conspiracy with one or more other persons unreasonably restrain trade or commerce; or

(3) Establish, maintain, use, or attempt to acquire monopoly

power over any substantial part of trade or commerce of this State for the purpose of excluding competition, or of controlling, fixing, or maintaining prices in such trade or commerce; or.

(4) Lease or make a sale or contract for sale of goods, wares, merchandise, * * * for use, consumption, enjoyment, or resale * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * * or service of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for such sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." ..

Under the antitrust argument, we consider initially defendant's contention that the concessions agreement was an illegal exclusive dealing contract. The trial court, after finding that the relevant line of commerce was restaurant and concessions services in general and that the relevant market was the State of Illinois, held that defendant failed to prove that the exclusive dealing contract worked a substantial lessening of competition in the relevant market area. The court also held that such proof was necessary in order to hold the contract illegal.

■■ We agree with the trial court's determination. We believe that the holding in *Tampa Electric Co. v. Nashville Coal Co.* (1961), 365 U.S. 320, is dispositive of the issue and requires such a result. In that case a twenty year exclusive dealing contract was challenged under section 3 of the Clayton Act and sections 1 and 2 of the Sherman Act. The Supreme Court, in holding that the contract was not illegal noted at p. 327:

"In practical application, even though a contract is found to be an exclusive dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected."

And at p. 333 the Court stated that exclusive dealing contracts:

"* * * have not been declared illegal *per se*. Even though a single contract between single traders may fall within the initial broad prosecution of the section, it must also suffer the qualifying disability, tendency to work a substantial—not remote—lessening of competition in the relevant competitive market."

The Court in *Tampa* also stated that if a long term exclusive dealing contract did not violate section 3 of the Clayton Act it could not possibly violate the less broad proscriptions of sections 1 and 2 of the Sherman Act.

The language of section 3 of the Clayton Act is substantially identical to that of section 3(4) of the Illinois Act, while the language of section 2 of the Sherman Act is substantially the same as that of section 3(3) of the Illinois Act. Indeed, the Committee Comments to section 3(3) of the Illinois Act specify that this section's prohibition is somewhat narrower than that applied to section 2 of the Sherman Act. Section 11 of the Illinois Antitrust Act (Ill. Rev. Stat. 1969, ch. 38, par. 60—11) provides:

"When the language of this Act is the same or similar to the language of a Federal Anti-trust Law, the courts of this state in construing this Act shall follow the construction given to the Federal Law by the Federal Courts."

■■ The construction of similar Federal antitrust statutes by the Supreme Court in *Tampa* dictates that the Illinois Act also be construed as requiring the proof of "a substantial lessening of competition in the relevant competitive market." The only case which we have found construing this aspect of the Illinois Act is in accord with this principle. (*Madsen v. Chrysler Corp.* (N.D. Ill. 1966), 261 F.Supp. 488, *vacated as moot* (7th Cir. 1967), 375 F.2d 773.) In the present case, as in *Tampa*, no adequate showing of foreclosure of competition was made. The instant contract was not proved to be an illegal exclusive dealing contract in violation of the Illinois Antitrust Act.

Defendant asserts that in a later case, *Fortner Enterprises, Inc. v. U.S. Steel Corp.* (1969), 394 U.S. 495, the Supreme Court altered its position with regard to exclusive dealing contracts. In that case, to which we shall refer below, the Court was not considering an exclusive dealing contract, but a "tie-in" contract. It is therefore not dispositive of this issue.

Under its antitrust argument, defendant secondly maintains that the instant contract was an illegal "tie-in" arrangement in violation of section 3(4) of the Illinois Antitrust Act.

Under a provision of the 1946 concessions contract Sportservice was to advance $50,000 to defendant. The contract provided that to pay this advance defendant was not to receive its percentage of receipts under the previously provided exclusive dealing arrangement until such percentage had accumulated to an amount of $50,000. No interest was to be charged to defendant. However the money was not to be advanced until defendant had expended $75,000 in improvements upon the track premises. Defendant contends that the long term exclusive dealing contract was "tied" to this "highly favorable" extension of credit. No evidence was introduced at trial as to actual performance of this provision

of the 1946 contract, but defendant proceeded on the theory that such a contract constituted a tying arrangement, illegal *per se.*

As we have already observed, the language of section 3(4) of the Illinois Act is substantially identical to section 3 of the Clayton Act. It is therefore necessary to construe the Illinois Act with regards to tie-ins in the same manner as the federal courts construe the federal acts.

■■ A tying arrangement is defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different or tied product. (*Northern Pacific R.R. Co. v. United States* (1958), 356 U.S. 1.) The extension of credit on favorable terms may be the basis of a tying arrangement, and once certain prerequisites are met, arrangements of this kind are illegal in and of themselves without a specific showing of competitive effect since the sole purpose of such agreements is to eliminate competition. (*Fortner Enterprises, Inc. v. U.S. Steel Corp.* (1969), 394 U.S. 495.) "When the seller enjoys a monopolistic position in the market for the 'tying' product, *or* if a sub-stantial volume of commerce in the 'tied' product is restrained, a tying arrangement violates the * * * standards expressed in Section 3 of the Clayton Act because from either factor the requisite lessening of competition is inferred." (*Times-Picayune Publishing Co. v. United States* (1953), 345 U.S. 594.) Either a course of conduct or a contract itself may be the basis of an illegal tie-in arrangement. *Advance Business Systems and Supply Co. v. SMC Corp.* (4th Cir. 1969), 415 F.2d 55.

However, the offering of two items as a unit does not necessarily give rise to an illegal tying arrangement. (*Northern Pacific R. Co. v. United States* (1958), 356 U.S. 1.) In that case the court, in finding an illegal tie, stated that the "preferential routing 'clauses at issue' conferred no benefit" on the other parties and has as their sole purpose the stifling of competition. The same principle has been recognized in other cases. In *Osborn v. Sinclair Refining Co.* (4th Cir. 1960), 286 F.2d 832, the court, while finding an illegal tie-in, pointed out that no separate benefit ac-crued to the buyer from the tied provision. And in *Advance Business Systems and Supply Co. v. SMC Corp.* (4th Cir. 1969), 415 F.2d 55, the court held that no legitimate reason existed for the tying contract clauses.

It must be noted that no evidence of economic leverage or coercive tactics by plaintiff's assignor at the time of the 1946 advance was intro-duced at trial. We therefore must consider the existence of an illegal tie solely from the face of the contract.

■■ We must agree with the trial court that the existence of a tying arrangement is not apparent from the face of the contract in the instant case. When the provisions of the 1946 concessions contract are con-sidered in sequence there is a separate benefit and performance by the

parties under each provision. Sportservice was granted exclusive catering rights in return for a certain percentage of the gross receipts from the concessions and for providing a stated quality of product and service. This provision, of itself, contained adequate consideration for the reciprocal performances. Furthermore, once the concessions agreement was established, the advance of credit provision also contained adequate consideration for the provided performances. While defendant was to receive $50,000 without payment of interest, Sportservice was to have, without expenditure by itself and before any advance of funds, a $75,000 improvement made to the facilities at which it was to be concessionaire. Such a substantial improvement would have greatly benefited plaintiff's assignor.

We agree with defendant that "after a prima facie tie has been established" the burden of showing a legitimate business reason for the tie shifts to the party attempting to uphold the contract (*Switzer Brothers, Inc. v. Locklin* (7th Cir. 1961), 297 F.2d 39.) However, in the instant case defendant has failed to establish a prima facie tie. On the face of the contract the provisions were separately stated and, very possibly severable, had that issue arisen. We cannot conclude from its face that the 1946 concessions agreement constituted an illegal tie-in contract.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

SCHWARTZ and McGLOON, JJ., concur.