**POLK BROS., INC., Plaintiff-Appellant,**
v.
**FOREST CITY ENTERPRISES, INC.,**
**Defendant-Appellee.**
No. 85–1374.
United States Court of Appeals,
Seventh Circuit.
Argued Sept. 23, 1985.
Decided Oct. 31, 1985.
Rehearing and Rehearing En Banc
Denied Nov. 26, 1985.

Peter B. Freeman, Hopkins & Sutter, Chicago, Ill., for plaintiff-appellant.

Leslie D. Locke, Ross & Hardies, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, EASTERBROOK, Circuit Judge, and GRANT, Senior District Judge.*

EASTERBROOK, Circuit Judge.

In 1972 Polk Bros., which owned some land in Burbank, Illinois, discussed with Forest City Enterprises the possibility of building a store large enough for both firms. Polk sells appliances and home furnishings; Forest City sells building materials, lumber, tools, and related products. Both have substantial chains of stores. They reached an agreement. Polk built a single building on a large parcel of land. The building is partitioned internally; Polk

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

and Forest City have separate entrances; Polk's store contains 64,000 square feet, Forest City's 68,000 square feet. One parking lot serves both businesses. Forest City became Polk's lessee in 1973. The stores opened in 1975. In 1978 Forest City exercised its option to buy, and Polk took back a mortgage for some $1.4 million.

The attraction of the arrangement was the complementary nature of the firms' products. The two stores together could offer a full line of goods for furnishing and maintaining a home. Both Polk and Forest City were concerned, however, that competition might replace cooperation. They negotiated a covenant restricting the products each could sell. Forest City promised not to sell "major appliances and furniture", although it reserved the right to sell "built-in appliances in connection with Kitchen-Build-In business." Polk Bros. promised not to "stock or sell Toro and Lawnboy products including lawn mowers, building materials, lumber and related products, tools, paints and sundries, hardware, garden supplies, automotive supplies or plumbing supplies." The parties agreed on a long list of things that both could sell, including "Gas & Electric Heaters[,] Built-In-Ranges[,] ... Snow Blowers[,] Lawn Mowers[,] ... [and] Hardware/Garden Mdse". When Forest City became an owner in 1978 the parties agreed that the restrictions in the lease would become covenants running with the land for 50 years.

Forest City's management changed in 1982. The new managers were concerned about declining profits from its three stores near Chicago. Two stores sold some major appliances; the one at Burbank did not. Forest City found it uneconomical to advertise the large appliances when one of the three outlets could not sell them. Forest City asked to be relieved of its covenant at Burbank. Polk said no. In January 1983 Forest City informed Polk that it considered the covenant invalid; Polk respond-

ed with a suit in state court seeking an injunction. Forest City removed the action to the district court under 28 U.S.C. § 1441, where it could have been filed initially under the diversity jurisdiction.

While the case was pending, Forest City started selling appliances. Polk sought emergency relief, and the district court referred the matter to a magistrate. The magistrate held an evidentiary hearing, made extensive findings of fact, and recommended that relief be granted. The district court, however, denied Polk's request, concluding both that the covenant is a *per se* violation of the antitrust law of Illinois and that Polk, having violated the covenant itself, may not obtain equitable relief. The district court then took additional evidence and denied Polk's request for a permanent injunction. We discuss the district court's two reasons in turn. The last portion of the opinion takes up some procedural matters, including a suggestion of mootness.

### I

The district court held the covenant invalid under § 3(1)(c) of the antitrust law of Illinois, Ill.Rev.Stat. ch. 38 § 60–3(1)(c), which declares unlawful contracts "allocating or dividing customers, territories, supplies, sales or markets, functional or geographical, for any commodity." That state's antitrust law, however, refers courts to federal antitrust law as a guide to questions of interpretation. See Ill.Rev. Stat. ch. 38 § 60–11; *People ex rel. Scott v. College Hills Corp.*, 91 Ill.2d 138, 154, 61 Ill.Dec. 766, 773–775, 435 N.E.2d 463, 470–72 (1982); *Maywood Sportservice, Inc. v. Maywood Park Trotting Association, Inc.*, 14 Ill.App.3d 141, 302 N.E.2d 79, 85–87 (1973). In order to find out what Illinois law forbids, we inquire what federal antitrust law forbids. Cf. *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150, 1155 (7th Cir.1984) (en banc), *rev'd on other grounds*, — U.S. —, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).

▮ Like federal law, Illinois law recognizes a difference between contracts unlawful *per se* and those that must be assessed under a Rule of Reason. *College Hills, supra.* Although federal law treats almost all contracts allocating products and markets as unlawful *per se*, see *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *United States v. Capitol Service, Inc.*, 756 F.2d 502 (7th Cir.1985); *General Leaseways, Inc. v. National Truck Leasing Association*, 744 F.2d 588 (7th Cir. 1984), the *per se* rule is designed for "naked" restraints rather than agreements that facilitate productive activity. Any firm involves cooperation among people who could otherwise be competitors. Polk Bros. and Forest City each comprise many stores. The managers of each store could set prices independently, competing against each other, but antitrust law does not require this. See *Copperweld, supra.*

▮ Cooperation is the basis of productivity. It is necessary for people to cooperate in some respects before they may compete in others, and cooperation facilitates efficient production. See *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). Joint ventures, mergers, systems of distribution—all these and more require extensive cooperation, and all are assessed under a Rule of Reason that focuses on market power and the ability of the cooperators to raise price by restricting output. The war of all against all is not a good model for any economy. Antitrust law is designed to ensure an appropriate blend of cooperation and competition, not to require all economic actors to compete full tilt at every moment. When cooperation contributes to productivity through integration of efforts, the Rule of Reason is the norm. *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, — U.S. —, 104 S.Ct. 2948, 2960–62, 82 L.Ed.2d 70 (1984) (*NCAA*).

▮ A court must distinguish between "naked" restraints, those in which the restriction on competition is unaccompanied by new production or products, and "ancil-

lary" restraints, those that are part of a larger endeavor whose success they promote. See *NCAA, supra.* If two people meet one day and decide not to compete, the restraint is "naked"; it does nothing but suppress competition. If A hires B as a salesman and passes customer lists to B, then B's reciprocal covenant not to compete with A is "ancillary." At the time A and B strike their bargain, the enterprise (viewed as a whole) expands output and competition by putting B to work. The covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties. Covenants of this type are evaluated under the Rule of Reason as ancillary restraints, and unless they bring a large market share under a single firm's control they are lawful. See *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 280–83 (6th Cir.1898) (Taft, J.), *aff'd*, 172 U.S. 211 (1899).

The evaluation of ancillary restraints under the Rule of Reason does not imply that ancillary agreements are not real horizontal restraints. They are. A covenant not to compete following employment does not operate any differently from a horizontal market division among competitors—not at the time the covenant has its bite, anyway. The difference comes at the time people enter beneficial arrangements. A legal rule that enforces covenants not to compete, even after an employee has launched his own firm, makes it easier for people to cooperate productively in the first place. Knowing that he is not cutting his own throat by doing so, the employer will train the employee, giving him skills, knowledge, and trade secrets that make the firm more productive. Once that employment ends, there is nothing left but restraint—but the aftermath is the wrong focus.

■ A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment. "[I]t is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects"

(*Copperweld, supra,* 104 S.Ct. at 2740), and so a court must be very sure that a category of acts is anti-competitive before condemning that category *per se.* See *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (*BMI*), and *NCAA, supra,* both of which assess under the Rule of Reason horizontal agreements that also involve cooperation among rivals that might produce larger output and more desirable products. Both *BMI* and *NCAA* emphasize that condemnation *per se* is an unusual step, one that depends on confidence that a whole category of restraints is so likely to be anticompetitive that there is no point in searching for a potentially beneficial instance. See also, e.g., *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 47–51, 97 S.Ct. 2549, 2556–58, 53 L.Ed.2d 568 (1977).

■ A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output. See *Addyston; BMI;* and *NCAA;* see also Robert H. Bork, *The Antitrust Paradox* 26–30 (1978). If the restraint, viewed at the time it was adopted, may promote the success of this more extensive cooperation, then the court must scrutinize things carefully under the Rule of Reason. Only when a quick look reveals that "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output" (*BMI, supra,* 441 U.S. at 19–20, 99 S.Ct. at 1562) should a court cut off further inquiry. See also *General Leaseways, supra,* 744 F.2d at 593–96; *Vogel v. American Society of Appraisers*, 744 F.2d 598, 603–04 (7th Cir.1984).

Polk Bros. and Forest City were deciding in 1972–73 whether to embark on a new venture—the building of a joint facility—that would expand output. The endeavor not only would increase the retail selling capacity in Burbank but also would provide a convenience to consumers. Polk Bros. does about 80% of its business in large appliances. If it could bring to the same location building supplies and the other

items in which Forest City specializes, shopping would be more convenient for consumers. As the district court put it, the parties "hoped to attract more customers because of the proximity of two stores, selling different but complementary items for the home."

 This was productive cooperation. The covenant allocating items between the retailers played an important role in inducing the two retailers to cooperate. The district court found that Polk "would not have entered into this arrangement, however, unless it had received assurances that [Forest City] would not compete with it in the sale of products that are the 'foundation of [Polk's] business'. ... The agreement not to compete was an integral part of the lease and land sale."

It is easy to see why. Polk spent substantial sums in advertising to attract customers to its stores, where it displayed and demonstrated the appliances. It might be tempting for another retailer to take a free ride on these efforts. Once Polk had persuaded a customer to purchase a color TV, its next door neighbor might try to lure the customer away by quoting a lower price. It could afford to do this if, for example, it simply kept the TV sets in boxes and let Polk bear the costs of sales personnel and demonstrations. Polk would not continue doing the work while its neighbor took the sales. It would do less demonstrating and promotion, to the detriment of consumers who valued the information. The Supreme Court has recognized that the control of free riding is a legitimate objective of a system of distribution. See *Monsanto, supra*, 104 S.Ct. at 1469–70; *Continental T.V., supra*, 433 U.S. at 55–57, 97 S.Ct. at 2560–61. See also *General Leaseways, supra*, 744 F.2d at 592–93; *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742 (7th Cir.1982); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers Advertising Association, Inc.*, 672 F.2d 1280 (7th Cir.1982).

The district court nonetheless concluded that the covenant is not ancillary because it was an essential part of the arrangement.

It reasoned: "The agreement not to compete was an integral part of the lease and land sale. This was not a sale with an ancillary agreement designed to protect an original owner's established business interests. The lease and land sale would not have been made by Polk Bros. absent an agreement not to compete.... Because the covenant not to compete was not merely ancillary to a sale of land or business, it constitutes a horizontal restraint of trade and a *per se* violation of the Illinois Antitrust Act..." There are two possible interpretations of this reasoning. One is that this covenant is not ancillary because it is so important. The other is that the agreement is not ancillary when it is part of the establishment of a new business, as opposed to the sale of an existing business. Neither is correct.

The reason for distinguishing between "ancillary" and "naked" restraints is to determine whether the agreement is part of a cooperative venture with prospects for increasing output. If it is, it should not be condemned *per se*. Only by exalting Webster's Third over the function of antitrust law could a court determine that a restraint is not "ancillary" because it was so important to the productive undertaking. The suggestion that the ancillary restraints doctrine does not apply to new ventures also slights the functions of the rule. The partners of a newly-formed law firm agree on fees and allocate subjects of specialty and clients among them; this "price fixing" and "market division" do not become unlawful just because the firm is new. The benefits of cooperation may be greatest when launching a new venture.

Polk Bros. and Forest City were cooperating to produce, not to curtail output; the cooperation increased the amount of retail space available and was at least potentially beneficial to consumers; the restrictive covenant made the cooperation possible. The Rule of Reason therefore applies. Discriminating analysis is necessary. Cf. *Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 141–42 (3d Cir.1978) (exclusivity clauses in leases at shopping

centers must be assessed under the Rule of Reason); Wesley J. Liebeler, *Antitrust Law and the New Federal Trade Commission,* 12 Sw.U.L.Rev. 166 (1981) (discussing free riding in shopping centers).

The first step in any Rule of Reason case is an assessment of market power. *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 265 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *General Leaseways, supra,* 744 F.2d at 596 (collecting cases); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 268–69 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1272, 71 L.Ed.2d 461 (1982) (collecting cases applying this principle to restrictive covenants); cf. *NCAA, supra,* 104 S.Ct. at 2965 (only "naked" arrangements may be condemned without proof of market power); *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1566–68, 80 L.Ed.2d 2 (1984) (market power is essential even in some *per se* cases). Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers, and it makes sense to understand their cooperation as benign or beneficial. Forest City has not argued that the arrangement in question here affects a substantial portion of any market. It governs two stores on a single site. The stores are surrounded by a vast parking lot; the site apparently attracts customers with cars, the very customers who have many other options within a reasonable distance. There was a full trial, and Forest City did not offer evidence from which the court could find market power. It does not suggest that we affirm the judgment on Rule of Reason grounds. Forest City has litigated the antitrust issue as one in which it prevails under the *per se* rule or not at all. "Not at all" it must be.

## II

The district court found that Polk could not enforce the covenant because of its disregard of its own obligations. Polk Bros. promised not to sell Toro products. It welched on this promise. Almost from the time the stores opened, Polk sold Toro lawn mowers and snowblowers at Burbank. Polk stocked these items throughout its chain, and apparently city-wide advertising led some customers to ask for the products at Burbank. Polk therefore kept a stock of Toro products in a back room. A customer who asked about a Toro product would be shown a picture from a catalog; a customer who wanted to see a Toro product would be conducted to the stock room, where they were available. This is not an ordinary way of doing business; one of Polk's employees at Burbank testified that he had never seen other merchandise being sold in this manner during his 31 years with the firm. Polk continued to sell Toro lawn mowers at Burbank until May 1982; the aggregate volume from 1979–82 was $438,-000. It continued to sell Toro snowblowers at Burbank until April 1984; the aggregate volume from 1979–84 was $1,660,000. Polk also sold $62,000 worth of Toro hose reels and lawn trimmers in those years.

Polk offers a number of excuses for this conduct. Its first manager at Burbank testified, for example, that because the goods were not delivered from the sales floor, the practice did not violate the covenant. Senior managers of Polk testified that only a lack of proper internal controls allowed its central warehouse to ship the products to Burbank, and that the firm stopped selling the products when it discovered the problem. Polk insisted that it was authorized to sell Toro products by the clause in the initial lease permitting Polk to sell snowblowers and lawn mowers, that Forest City consented in writing in 1975 to the sale of Toro snowblowers, and that Forest City knew of and did not object to the sales of all Toro products. Forest City replied that its consent covered only 1975–76 and that it objected annually to other sales and was told that the sales would cease.

The whisper, "Psst, wanna buy some Toro snowblowers?", followed by a trip to the back room, is not an ordinary part of a retail business. It may have been hard for Polk to resist selling at Burbank products it advertised and sold in large volumes

elsewhere, but the covenant obliged it to do so. The district court was entitled to credit Forest City's reports of annual protests, to conclude that the permission granted in 1975 lasted but one year, and to hold that the specific ban on selling Toro products survived the general permission to sell snowblowers and lawn mowers. It may be that Polk believed in good faith (based on the 1975 letter) that it was entitled to sell Toro snowblowers (though one wonders why, if this is so, Polk did not put the products on the sales floor), but the district court found that it had no similar support for the covert sales of lawn mowers. Indeed, when Polk requested permission to sell Toro lawn mowers in 1977, Forest City refused in writing. The district court believed Forest City's version of events, as it was entitled to. "When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). See also *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1427–1430 (7th Cir.1985).

It does not follow, however, that the district court was free to excuse Forest City from complying with its obligations. By the time Forest City repudiated the covenant in January 1983, Polk had stopped selling the lawn mowers. Forest City sold a few black and white television sets and microwave ovens at Burbank in April 1982. Polk protested, and Forest City promptly quit selling these items. Forest City objected in turn to Polk's sales of Toro lawn mowers. Polk both removed the Toro lawn mowers from the Burbank store in May 1982 and brought the snowblowers out into the open, explicitly relying on the 1975 letter as authority. When this dispute ripened, then, Polk was in compliance with the covenant except for the disputed Toro snowblowers. The magistrate who conducted the trial concluded that until the incident in April 1982 Forest City had not told Polk that it viewed Polk's violations as substantial, and that "once Forest City made a demand for strict compliance Polk Bros. complied."

The district court invoked the doctrine of unclean hands. The plaintiff seeking an injunction to enforce a covenant running with the land, the court held, must show "that he has exercised good faith and appropriate diligence in performing his own obligations under the agreement." Polk could not show this; to the contrary it had committed a "substantial and continued breach" of its covenants. Polk's "nearly continuous sale of the prohibited items, its practice of concealing these sales, and its lack of response to [Forest City's] complaints show a wilful breach of its obligations under the restrictive covenant." According to the court, one party's wilful breach precludes enforcement of the other's obligations. We disagree with this conclusion.

It is undisputed that Polk honored its covenant not to sell "building materials, lumber and related products, tools, paints and sundries, hardware, ... automotive supplies or plumbing supplies." These were the principal products Forest City offered at Burbank. Polk did sell Toro products, covertly and in wilful violation of its duties. Yet although Polk's sales of Toro products came to about $2 million from 1979 through 1984, the district court did not find that these sales injured Forest City. The record does not contain any evidence showing the importance of the sales of Toro products to Forest City at Burbank or at any other store. There is not a hint that Toro sales were a substantial portion of Forest City's business at any store or that Forest City did less Toro business at Burbank than elsewhere. As the district court put it, Forest City "has offered no evidence concerning any losses due to [Polk's] sale of restricted products"; more, John Evancho, Forest City's district manager, testified "that he did not believe that [Polk's] sales of prohibited goods were hurting [Forest City] 'that much'." Evancho even filed an affidavit conceding that "Forest City has never sought to enforce the restraint of trade provisions or to restrict Polk Bros.' sales activities in any way." This is the approach of a firm un-

concerned by the breach of covenant—Polk may have been violating the rules, but so long as its violations did not harm Forest City, Forest City chose not to stand on its rights.

The law of Illinois entitles a party to obtain specific performance of covenants running with the land. *Housing Authority of Gallatin County v. Church of God*, 401 Ill. 100, 81 N.E.2d 500, 504 (1948). The covenant between Polk and Forest City reinforces this rule. It states that the remedy at law for a breach "will be inadequate" and that either party "shall be entitled to injunctive relief" in addition to damages. Specific performance of a covenant such as this is necessary to achieve the objectives of the contracting parties. They wanted to limit free riding on each other's sales efforts. This is a continuing concern; damages for past violations will not ensure that these adjoining retailers conduct their future efforts efficiently. If a court declines to enforce this covenant, the parties must either adopt the covenant anew (which may be a difficult bit of negotiation) or forgo its benefits—for themselves and for their customers. In either case the loss may be well out of line with the injury the unauthorized sales inflicted on Forest City. For these and other reasons Illinois treats "unclean hands" as an exceptional defense, one that rarely prevents the grant of the relief that would otherwise be appropriate. E.g., *Baal v. McDonald's Corp.*, 97 Ill.App.3d 495, 501, 52 Ill.Dec. 957, 962, 422 N.E.2d 1166, 1171 (1981); *Mascenic v. Anderson*, 53 Ill.App.3d 971, 972, 11 Ill.Dec. 718, 719, 369 N.E.2d 172, 173 (1977); *Illinois Power Co. v. Latham*, 15 Ill.App.3d 156, 168, 303 N.E.2d 448, 457 (1973).

The Illinois cases are consistent with those of the federal courts, which have concluded that injunctions issue when appropriate under rules that can be announced in advance and applied evenhandedly. See *TVA v. Hill*, 437 U.S. 153, 193–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978); *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380

(7th Cir.1984); *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 937–40 (7th Cir.1974) (concurring opinion). Equity is no longer granted or withheld according to the chancellor's sensibilities and his regard for the uprightness of the parties. The injunction, like other remedies, is designed to achieve compliance with established rules, and even the wicked have a right to treatment according to the rules. An injunction that is otherwise appropriate may be withheld to achieve some competing objective, see *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–18, 102 S.Ct. 1798, 1803–6, 72 L.Ed.2d 91 (1982), but not to express disapproval of the plaintiff's conduct. As we put it in *Shondel*, 755 F.2d at 868 (citation omitted): "Today, 'unclean hands' really just means that in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to. An obviously sensible application of this principle is to withhold an equitable remedy that would encourage or reward (and thereby encourage) illegal activity...."

Illinois follows this approach. The most common formulation of the "unclean hands" doctrine in recent Illinois cases is that "one seeking equitable relief cannot take advantage of his own wrong." *Fair Automotive Repair, Inc. v. Car Service Systems, Inc.*, 128 Ill.App.3d 763, 84 Ill. Dec. 25, 29, 471 N.E.2d 554, 558 (1984) (collecting other cases). If the plaintiff creates or contributes to the situation on which it relies, the court denies equitable relief in order to deter the wrongful conduct. "One who has defrauded his adversary to his injury will not be heard to assert a right in equity." *Fruhling v. County of Champaign*, 95 Ill.App.3d 409, 51 Ill.Dec. 508, 414, 420 N.E.2d 1066, 1071 (1981). See also, e.g., *Jaffe Commercial Finance Co. v. Harris*, 119 Ill.App.3d 136, 74 Ill.Dec. 722, 726, 456 N.E.2d 224, 228 (1983); *LaSalle National Bank v. Hoffman*, 1 Ill.App.3d 470, 274 N.E.2d 640 (1971); *American National Bank & Trust Co. of Chicago v. Hamilton Industries*

*International, Inc.,* 583 F.Supp. 164 (N.D. Ill.1984).

When the plaintiff's wrongful conduct did not lead to a situation from which the plaintiff seeks to take further advantage, the courts of Illinois routinely grant equitable relief notwithstanding prior transgressions. Sometimes they come to this end by saying that the obligation sought to be enforced was not "in connection with the very transaction complained of" (see *Baal, supra,* 52 Ill.Dec. at 962, 422 N.E.2d at 1171); if the events are distinct, the court will enforce the separate promise despite the earlier wrong. They have been most creative in severing transactions that to the untrained eye appear single. E.g., *Carlyle v. Jaskiewicz,* 124 Ill.App.3d 487, 79 Ill.Dec. 847, 464 N.E.2d 751 (1984) (a fraudulent acquisition of an interest in land and the obligation to pay expenses in connection with that interest are separate transactions); *Ellis v. Photo America Corp.,* 113 Ill.App.3d 493, 69 Ill.Dec. 417, 447 N.E.2d 852 (1983) (an employee's fraudulent misappropriation of his employer's funds is a transaction separate from the employment, so the employee may obtain the equitable remedy of quantum meruit for work done). Sometimes the state's courts enforce the promise by saying that violations by one party of its own duties do not prevent enforcement of the deal unless substantial violations have caused the original function of the covenant to be lost. *Punzak v. Delano,* 11 Ill.2d 117, 120, 11 Ill.Dec. 117, 118, 142 N.E.2d 64, 65 (1957). Usually this means that the violations must have been so extensive as to upset the original bargain.

Under any of these variations the courts of Illinois would enforce Forest City's promises. Polk did not obtain the covenant by fraud or wrongfully propel Forest City into a situation from which Polk now seeks further advantage. The covenants were negotiated at arms' length, and there was no wrongdoing in their formation. Polk's transgressions are logically distinct from the duties it seeks to enforce against Forest City. Polk's violations also were not substantial in the sense Illinois uses.

From 1975 until Forest City disavowed its obligations in 1983, the parties generally lived by the covenants; Forest City sold building supplies and household goods but not appliances, and Polk sold appliances but not any of Forest City's specialties. In January 1983 Polk was in compliance except for Toro snowblowers, which it was selling openly under a claim of right. The record does not demonstrate how, if at all, Polk's sales of Toro products injured Forest City.

Forest City has assembled an armada of cases in support of the district court's decision. Many of them, however, are not "unclean hands" cases. Two strands of Illinois law in addition to unclean hands may prevent enforcement of a covenant, and these need to be kept distinct. One is abandonment, the other repudiation.

*McGovern v. Brown,* 317 Ill. 73, 147 N.E. 664 (1925), on which Forest City strongly relies, is an example of abandonment. A covenant required all buildings in a development to be set back 30 feet from the street. For an extended period everyone built right up to the street; then one who had done so attempted to require others to respect the setback. The Supreme Court of Illinois found that the setback had been abandoned by all; it was too late to enforce a common building line. A covenant is abandoned when the parties repeatedly acquiesce in long-lasting violations, indicating that none intends to enforce the restrictions. See *Knolls Associates v. Hinton,* 71 Ill.App.3d 205, 27 Ill.Dec. 629, 389 N.E.2d 693 (1979). Usually abandonment includes a change of position making costly the restoration of the state of affairs contemplated by contract. Unlike unclean hands, abandonment does not require wilful or bad faith behavior. Mutual disregard and costly restoration were the essential features of *McGovern.* There is no similar mutual abandonment here, no similar difficulty in enforcing the agreement prospectively.

*Johnstowne Centre Partnership v. Chin,* 99 Ill.2d 284, 76 Ill.Dec. 80, 458 N.E.2d 480 (1983), another of Forest City's cases, illustrates repudiation. Chin signed a lease to operate a restaurant at a shopping center; the center pledged not to al-

low any competing restaurant. When the shopping center nonetheless leased space to another restaurant, Chin walked away from the lease. The Supreme Court of Illinois held that he could. Chin had leased "exclusive" space; the shopping center had not furnished him with such space; he was entitled to set aside the whole contract. Forest City has not offered to set aside its whole contract; it wants the benefit (the right to occupy the store) without the detriment of the covenant. And even if Forest City could have repudiated its entire package of obligations, vacated the store, and conveyed the land back to Polk at some earlier time—an issue we need not decide— it may not do so now, for Polk (unlike the shopping center) is in compliance with its obligations.

We therefore conclude that Forest City has not made out the elements of the "unclean hands" defense in Illinois or of either related doctrine. Polk is not trying to take advantage of its own wrong; the covenants were not abandoned; Forest City did not try to repudiate the whole contract; Polk's transgressions were not legally substantial; prospective relief may fully implement this bargain. Polk is entitled to the permanent injunction it seeks. Polk's relief may be conditioned, however, on its iron-clad undertaking to live up to its end of the bargain, and the district court should incorporate this into the injunction. *Ross v. Steiner*, 66 Ill.App.3d 567, 23 Ill.Dec. 604, 384 N.E.2d 398 (1978). Forest City also has an action for damages caused by Polk's sales, if it can establish any and if it has preserved the claim.

### III

After the briefing had been completed on appeal, Polk moved to dismiss the case as moot. It stated that Forest City had vacated the store and leased it to a firm that does not sell appliances. Forest City apparently has closed all of its stores near Chicago. Forest City responded with an affidavit that the store had been leased to Service Merchandise Co., which planned to sell appliances, and that Service Merchandise has an option to buy. Polk replied with requests to add Service Merchan-

dise as a party, to substitute it for Forest City, and to enjoin it, too, from selling appliances.

We deny all of these motions. The case is not moot. The covenant runs with the land. It binds any lessee or buyer from Forest City, so that the disposition of this case will have a real effect no matter who owns or operates the store. It also influences the price Forest City may realize for its store. As for the addition of Service Merchandise as a party: The affidavits concerning what Forest City and Service Merchandise plan to do with Forest City's store present issues of fact. The district court may need to explore the facts more fully. It is enough for now that the injunction against Forest City will bind those in "active concert or participation" with Forest City who receive actual notice. Fed.R. Civ.P. 65(d). See *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 12–15, 65 S.Ct. 478, 480–81, 89 L.Ed. 661 (1945); *G & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 34–40 (1st Cir.1980); *Silvers v. Traverse*, 82 Iowa 52, 47 N.W. 888 (1891). If Service Merchandise should argue that it does not fit within the terms of Rule 65(d), the district court then must decide whether to add it as a party.

REVERSED.